Affirmed by published opinion. Judge WILKINSON wrote the majority opinion, in which Judge KEENAN joined. Judge NIEMEYER wrote a dissenting opinion.
OPINION
WILKINSON, Circuit Judge:
On December 17, 2007, Janet Joyner and Constance Lynn Blackmon decided to attend a meeting of the Forsyth County Board of Commissioners. Like all public Board meetings, the gathering began with an invocation delivered by a local religious leader. And like almost every previous invocation, that prayer closed with the phrase, “For we do make this prayer in Your Son Jesus’ name, Amen.” The December 17 prayer also made a number of references to specific tenets of Christianity, from “the Cross of Calvary” to the “Virgin Birth” to the “Gospel of the Lord Jesus Christ.”
In response, Joyner and Blackmon filed suit against the county, alleging that the December 17' prayer represented one instance of the Board’s broader practice of sponsoring sectarian opening prayers at its meetings. After conducting a thorough review of the factual record, the district court concluded that the Board’s legislative prayer policy did in fact violate the Establishment Clause by advancing and endorsing Christianity to the exclusion of other faiths.
The district court’s ruling accords with both Supreme Court precedent and our own. Those cases establish that in order to survive constitutional scrutiny, invocations must consist of the type of nonsectarian prayers that solemnize the legislative task and seek to unite rather than divide. Sectarian prayers must not serve as the gateway to citizen participation in the af *343 fairs of local government. To have them do so runs afoul of the promise of public neutrality among faiths that resides at the heart of the First Amendment’s religion clauses.
I.
The Forsyth County Board of Commissioners (the Board, for short) is the elected body that governs Forsyth County, North Carolina. The county has approximately 350,000 residents and encompasses the city of Winston-Salem. The Board’s twice-monthly meetings are open to the public, and for years the Board has decided to start the meetings with a prayer and a recital of the Pledge of Allegiance.
Until 2007, the Board did not have a written policy regarding the prayers but followed a relatively routine practice. Using the Yellow Pages, internet research, and consultation with the local Chamber of Commerce, the clerk to the Board compiled and maintained the “Congregations List” — a database of all religious congregations with an established presence in the community. No eligible congregation was excluded, and any congregation could confirm its inclusion by writing to the clerk. Each November, the clerk would update the list and then mail an invitation to the “religious leader” of each congregation. The letter informed those individuals that they were eligible to deliver an invocation and could schedule an appointment on a first-come, first-serve basis. The letter then closed as follows:
This opportunity is voluntary, and you are free to offer the invocation according to the dictates of your own conscience. To maintain a spirit of respect and ecumenism, the Board requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker.
In order to ensure that a variety of religious leaders came forth, the Board decided not to schedule any leader for consecutive meetings or for more than two meetings in any calendar year.
Once a potential speaker accepted, the Board would add the invocation to the meeting agenda, often alongside the name of the individual giving the invocation, his congregation, and the location of his place of worship. Prior to the opening gavel that officially began the meeting, the Board Chair would introduce the speaker and invite those who wished to stand to do so. After the speaker took the podium, the commissioners (and most audience members) would stand, and the prayer would commence.
While the Board took a hands-off approach to the actual content of the prayers, that content is relevant here. As the district court found and as audio recordings confirm, the prayers frequently contained references to Jesus Christ; indeed, at least half of the prayers offered between January 2006 and February 2007 contained concluding phrases such as “We pray this all in the name under whom is all authority, the Lord Jesus Christ,” “[I]t’s in Jesus’ name that we pray[,] Amen,” and “We thank You, we praise You, and we give Your name glory, and we ask it all in Your Son Jesus’ name.”
In March 2007, Joyner, Blackmon, and a third plaintiff (who is no longer part of the case) filed a lawsuit seeking declaratory and injunctive relief. Claiming to have attended or watched several Board meetings, the plaintiffs alleged that the Board, “through both its actions and inactions, is sponsoring sectarian opening prayers at [its] meetings.” They requested a judgment declaring that the Board’s *344 sponsorship of sectarian prayers violated the Establishment Clause along with an injunction preventing future sectarian prayers.
After that lawsuit was filed, the Board decided to formalize its legislative prayer policy. The text of the policy codified past practice, with a few minor variations. Under the ■ written policy, the invocation would no longer be “listed or recognized as an agenda item for the meeting so that it may be clear the prayer is not considered a part of the public business.” The policy also stated that nobody “shall be required to participate in any prayer that is offered,” and that “[njeither the Board nor the Clerk shall engage in any prior inquiry, review of, or involvement in, the content of any prayer to be offered by an invocational speaker.” Finally, the Board clarified that the prayers were “not intended, and shall not be implemented or construed in any way, to affiliate the Board with, nor express the Board’s preference for, any faith or religious denomination.” Instead, the stated goal of the policy was to “acknowledge and express the Board’s respect for the diversity of religious denominations and faiths represented and practiced among the citizens of Forsyth County.”
Despite that language, the prayers repeatedly continued to reference specific tenets of Christianity. These were not isolated occurrences: between May 29, 2007 and December 15, 2008, almost four-fifths of the prayers referred to “Jesus,” “Jesus Christ,” “Christ,” or “Savior.” In particular, most of the prayers closed by mentioning Jesus, using such phrases as “This we pray, in the gracious name of the Lord Jesus Christ,” “[I]n Jesus’ name we pray,” and “In the name of Jesus Christ, our Savior.” None of the prayers mentioned non-Christian deities.
One of those prayers is particularly salient to this lawsuit. On December 17, 2007, Joyner and Blackmon decided to attend the Board meeting hoping to observe the proceedings — and in Joyner’s case, to hear the Board’s discussion of an agenda item and to comment during the public participation period. As always, the meeting began with an invocation, this time by a pastor from Winston-Salem. According to Blackmon and Joyner, the Chair of the Board asked the audience to stand for the prayer. At that point, the commissioners and most of the audience stood and bowed their heads.
Before beginning the prayer, the pastor offered the following salutation to the board:
Before we pray, I would like to say my appreciation to the ones that serve here on the Board. I’m a lifelong resident of Forsyth County, grew up in Lewisville, lived in Winston-Salem, and for the last two years, I lived in Kernersville, and I appreciate your service to me and also the stand the Board took as a whole allowing me, a minister of the Gospel of the Lord Jesus Christ, to be able to pray as the New Testament instructs. And I appreciate that.
The pastor then continued with the prayer itself:
May we pray. Heavenly Father, tonight we are so grateful for the privilege to pray that is made possible by Your Son and his intercessory work on the Cross of Calvary. And Lord, we think about even a week from tomorrow, Lord, we’ll remember that Virgin Birth, and how He was born to die. And we’re so grateful tonight that we can look in the Bible and see how You instituted government.
The pastor then discussed the influence of religion in world affairs, sought divine guidance for the Board, and closed with *345 the salutation, “For we do make this prayer in Your Son Jesus’ name, Amen.”
On Joyner and Blackmon’s account, the overall atmosphere .made them feel distinctly unwelcome and “coerced by [their] government into endorsing a Christian prayer.” Blackmon claimed that she felt compelled to stand and bow her head because of the Chair’s instruction to stand and because of the audience’s response. Joyner offered a similar account, believing that if she had failed to comply, it would have “negatively prejudice[d] consideration of [her] intended petition as a citizen appearing for public comment.” Both characterized the prayer as sectarian, with Blackmon referring to it as including a “one-minute sermon.”
In response, Joyner and Blackmon amended their lawsuit. Their new complaint requested similar relief to its predecessor: a declaratory judgment that the Board’s “allowance and sponsorship of sectarian prayers” at its meetings violates the Constitution, and an injunction preventing the Board from “knowingly, intentionally or negligently allowing sectarian prayers ... before, during or after” the meetings. The complaint contained new factual allegations, as well: that the December 17, 2007 prayer was “distinctly sectarian,” that the new policy had “ensure[d] that prayer-givers ... are permitted to give a sectarian prayer,” and that the policy had actually increased the percentage of sectarian prayers from half to just under four-fifths of all prayers.
After both parties filed motions for summary judgment, the magistrate judge concluded that the plaintiffs should prevail. The court began by noting that both Supreme Court and Fourth Circuit precedent prevent the government from exploiting prayer opportunities to affiliate the government with a specific faith. And it acknowledged that the “Defendant’s policy does many things right,” such as “striving] to include a wide variety of speakers from diverse religious faiths.” But looking at the factual record, the magistrate judge concluded that the prayers themselves pushed the policy across the constitutional line. In the magistrate’s view, the prayers occurring after the policy’s enactment “displayed] a preference for Christianity over other religions by the government” and “affiliate[d] the Board with a specific faith or belief,” meaning that the prayers could not “be considered non-sectarian or civil prayer.”
In a brief order, the district court adopted the magistrate’s recommendation. It conducted a de novo review of the factual record and agreed that the policy “has resulted in Government-sponsored prayers that advance a specific faith or belief and have the effect of affiliating the Government with that particular faith or belief.” Accordingly, the district court issued a declaratory judgment that the “invocation Policy, as implemented, violates the Establishment Clause of the Constitution” and an injunction against the Board “continuing the Policy as it is now implemented.” This appeal followed.
II.
At its core, this is not a case about the Establishment Clause in general, but about legislative prayer in particular. This distinction is critical, for legislative prayer lies at the heart of two intersecting realities.
A.
On the one hand, it is a historical fact that legislative prayer “is deeply embedded in the history and tradition of this country.” Marsh v. Chambers, 463 U.S. 783, 786, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). Indeed, “[f]rom colonial times *346 through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom.” Id.; see also Cnty. of Allegheny v. ACLU, 492 U.S. 573, 603, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (recognizing the unique history of legislative prayer). Taking heed of this basic reality, the Supreme Court has acknowledged the legitimacy of legislative prayer on multiple occasions.
For example, in Marsh, the Court confronted the constitutionality of the Nebraska Legislature’s decision to have a paid chaplain offer a brief prayer before each legislative session. See Marsh, 463 U.S. at 784-85, 103 S.Ct. 3330. The Court engaged in a lengthy historical analysis, noting that “the men who wrote the First Amendment Religion Clauses did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress.” Id. at 788, 103 S.Ct. 3330. The practice of legislative prayer was similarly commonplace in the states. See id. at 788-89, 103 S.Ct. 3330. Based on that history, the Court concluded that there was “no real threat to the Establishment Clause arising from a practice of prayer similar to that now challenged.” Id. at 791, 103 S.Ct. 3330.
While Marsh is the only Supreme Court case to address directly the constitutionality of legislative prayer, the Court has since reaffirmed its support for the practice while ruling on the propriety of two allegedly unconstitutional holiday displays located on public property in Pittsburgh. See Allegheny, 492 U.S. 573, 109 S.Ct. 3086. Though the Court ruled that one of those displays was unconstitutional, it was careful to reaffirm the status of legislative prayer as one of our “accepted traditions dating back to the Founding.” Id. at 602, 109 S.Ct. 3086 (quotation and citation omitted).
We have followed the Supreme Court’s guidance in repeatedly upholding the practice of legislative prayer. In Wynne v. Town of Great Falls, 376 F.3d 292 (4th Cir.2004), we considered the legislative prayer policy employed by the Town Council of Great Falls, South Carolina. In so doing, we observed that “[pjublic officials’ brief invocations of the Almighty before engaging in public business have always, as the Marsh Court so carefully explained, been part of our Nation’s history.” Wynne, 376 F.3d at 302. And while we determined that the town council’s policy was unconstitutional as implemented, that decision was by no means based on a wholesale condemnation of legislative prayer. To the contrary, we made quite clear that invocations were still permissible. See id. (“The Town Council of Great Falls remains free to engage in ... invocations prior to Council meetings.”)
We drove this point home in Simpson v. Chesterfield County Board of Supervisors, 404 F.3d 276 (4th Cir.2005), taking care to explain the numerous salutary benefits of invocations. In Simpson, a citizen challenged the Chesterfield County Board of Supervisors’ invocation practice, which afforded religious leaders throughout the county an opportunity to give a “non-sectarian” prayer at the start of board meetings on a first-come, first-serve basis. Simpson, 404 F.3d at 278-79. We rejected her challenge. Harkening back to Marsh, we observed that “legislative invocations perform the venerable function of seeking divine guidance for the legislature” and “constitute ‘a tolerable acknowledgment of beliefs widely held among the people of this country.’ ” Id. at 282 (quoting Marsh, 463 U.S. at 792, 103 S.Ct. 3330). See also Turner v. City Council of *347 the City of Fredericksburg, 534 F.3d 352, 356 (4th Cir.2008) (“The Council’s decision to open its legislative meetings with nondenominational prayers does not violate the Establishment Clause.”).
In sum, invocations at the start of legislative sessions can solemnize those occasions; encourage participants to act on their noblest instincts; and foster the humility that recognition of a higher hand in human affairs can bring. There is a clear line of precedent not only upholding the practice of legislative prayer, but acknowledging the ways in which it can bring together citizens of all backgrounds and encourage them to participate in the workings of their government.
B.
At the same time, both the Supreme Court and this circuit have been careful to place clear boundaries on invocations. That is because prayer in governmental settings carries risks. The proximity of prayer to official government business can create an environment in which the government prefers — or appears to prefer— particular sects or creeds at the expense of others. Such preferences violate “[t]he clearest command of the Establishment Clause”: that “one religious denomination cannot be officially preferred over another.” Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). After all, “[w]hatever else the Establishment Clause may mean ... it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed.” Allegheny, 492 U.S. at 605, 109 S.Ct. 3086. More broadly, while legislative prayer has the capacity to solemnize the weighty task of governance and encourage ecumenism among its' participants, it also has the potential to generate sectarian strife. Such conflict rends communities and does violence to the pluralistic and inclusive values that are a defining feature of American public life.
The cases thus seek to minimize these risks by requiring legislative prayers to embrace a non-sectarian ideal. That ideal is simply this: that those of different creeds are in the end kindred spirits, united by a respect paid higher providence and by a belief in the importance of religious faith. Yet an ideal so much in evidence in our coinage, in the Pledge of Allegiance, in our own “God save the United States and this Honorable Court” — an . ideal long thought to be both meaningful and unifying — now strikes the dissent as unacceptably bland. For the dissent astonishingly disparages this ideal, dismissing non-sectarian invocations as mere “civil nicet[ies]” that treat prayer “agnostically.” Post at 356. This view not only diminishes meaningful observances offered every day across this country. It denies to invocations their inclusive aspect.
It was, in fact, this inclusive aspect that the Supreme Court took care to emphasize. In Marsh, for example, the Court noted that one of the reasons that the founders had no objection to legislative prayer was that the invocations commonplace at the time represented “conduct whose ... effect ... harmonize[d] with the tenets of some or all religions.” Marsh, 463 U.S. at 792, 103 S.Ct. 3330 (quoting McGowan v. Maryland, 366 U.S. 420, 442, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)). Nebraska’s invocations fell within that tradition, going so far as to remove “all references to Christ after a 1980 complaint from a Jewish legislator,” id. at 793 n. 14, 103 S.Ct. 3330, in order to ensure that the prayers represented a “tolerable acknowledgement of beliefs widely held among the people of this country,” id. at 792, 103 S.Ct. 3330. These efforts at ecumenism were essential to the Court’s holding: it concluded that the prayer policy was con *348 stitutional because there was “no indication that [Nebraska’s] prayer opportunity ha[d] been exploited to proselytize or advance any one, or to disparage any other, faith or belief.” Id. at 794-95, 103 S.Ct. 3330. Indeed, while the Court noted that “[t]he content of the prayer[s] is not of concern to judges,” id. at 794, 103 S.Ct. 3330, it adopted such a hands-off approach only once it was satisfied that Nebraska’s prayers did not “proselytize or advance” a particular creed, id.
Allegheny underscored the point, clarifying that “[t]he legislative prayers involved in Marsh did not violate [the Establishment Clause] because the particular chaplain had ‘removed all references to Christ.’ ” Allegheny, 492 U.S. at 603, 109 S.Ct. 3086 (quoting Marsh, 463 U.S. at 793 n. 14, 103 S.Ct. 3330) (emphasis added). As the Court observed, Marsh “recognized that not even the ‘unique history’ of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief.” Id. (quoting Marsh, 463 U.S. at 791, 103 S.Ct. 3330) (citation omitted). Moreover, the Court took pains to distinguish between the constitutionality of “a specifically Christian symbol, like a creche, and more general religious references, like the legislative prayers in Marsh.” Id.
Our cases have hewed to this approach, approving legislative prayer only when it is nonsectarian in both policy and practice. In Wynne, the town council had adopted an allegedly neutral prayer policy but had nevertheless commenced every meeting with opening prayers that expressly and repeatedly referred to Jesus Christ. See Wynne, 376 F.3d at 295, 296 n. 2. Reading Marsh and Allegheny to “teach that a legislative body cannot, consistent with the Establishment Clause, ‘exploit’ this prayer opportunity to ‘affiliate’ the Government with one specific faith or belief in preference to others,” we struck down the policy. Id. at 298. The basis for our decision was straightforward: unlike in Marsh, where “the chaplain had affirmatively ‘removed all references to Christ,’ ” id. (quoting Marsh, 463 U.S. at 793 n. 14, 103 S.Ct. 3330), the prayers in Wynne “ ‘frequently’ contained references to ‘Jesus Christ,’ and thus promoted one religion over all others, dividing the Town’s citizens along denominational lines,” id. at 298-99. The prayers thus ran afoul of Marsh’s proscription of prayers that “advance any one ... faith or belief.” Id. at 300 (quoting Marsh, 463 U.S. at 794-95, 103 S.Ct. 3330). We found unpersuasive the council’s arguments that its references to Jesus Christ fell within “Marsh’s approval of a prayer ‘in the Judeo-Christian tradition,’ ” id. at 299 (quoting Marsh, 463 U.S. at 793, 103 S.Ct. 3330), for the prayers referenced Christ— “a deity in whose divinity only those of the Christian faith believe,” id. at 300.
We reaffirmed that basic principle just one year later in Simpson. The policy at issue there explicitly required nonsectarian prayers. It mandated that each “invocation must be non-sectarian with elements of the American civil religion and must not be used to proselytize or advance any one faith or belief or to disparage any other faith or belief.” Simpson, 404 F.3d at 278. We upheld the policy precisely because the prayers were nondenominational. We noted that unlike in Wynne, where the “sectarian references in invocations were far more than occasional or incidental,” id. at 283, the board in Simpson had “aspired to non-sectarianism and requested that invocations refrain from using Christ’s name or, for that matter, any denominational appeal,” id. at 284. Indeed, the board’s policy in action had resulted in “a wide variety of prayers” that “described divinity in wide and embracive terms,” displaying “ecumenism ... consonant with our char *349 acter both as a nation of faith and as a country of free religious exercise and broad religious tolerance.” Id.; see also Turner, 534 F.3d at 356 (“The Council’s decision to provide only nonsectarian legislative prayers places it squarely within the range of conduct permitted by Marsh and Simpson. The restriction that prayers be nonsectarian in nature is designed to make the prayers accessible to people who come from a variety of backgrounds, not to exclude or disparage a particular faith.”).
The case law thus sets out clear boundaries. As amicus Baptist Joint Committee for Religious Liberty puts it, “this [cjourt’s legislative prayer decisions have recognized that the exception created by Marsh is limited to the sort of nonsectarian legislative prayer that solemnizes the proceedings of legislative bodies without advancing or disparaging a particular faith.” Amicus Br. Baptist Joint Comm, for Religious Liberty 13. Put differently, legislative prayer must strive to be nondenominational so long as that is reasonably possible — it should send a signal of welcome rather than exclusion. It should not reject the tenets of other faiths in favor of just one. Infrequent references to specific deities, standing alone, do not suffice to make out a constitutional case. But legislative prayers that go further — prayers in a particular venue that repeatedly suggest the government has put its weight behind a particular faith — transgress the boundaries of the Establishment Clause. Faith is as deeply important as it is deeply personal, and the government should not appear to suggest that some faiths have it wrong and others got it right.
III.
Taken together, the principles set forth by the Supreme Court in Marsh and Allegheny and by this circuit in Wynne and Simpson establish that the Board’s policy, as implemented, cannot withstand scrutiny. The December 17, 2007 prayer — the prayer that led to the plaintiffs’ amended complaint — clearly crossed the constitutional line. In Wynne, we concluded that the town council’s prayers “clearly ‘advance[d]’ one faith, Christianity, in preference to others, in a manner decidedly inconsistent with Marsh,” Wynne, 376 F.3d at 301, because they ended with a solitary reference to Jesus Christ. The prayer here went further. It discussed specific tenets of the Christian religion, from the “Cross of Calvary” to the “Virgin Birth” to the “Gospel of the Lord Jesus Christ.” The December 17 invocation thus “engage[d], as part of public business and for the citizenry as a whole, in prayers that contained] explicit references to a deity in whose divinity only those of one faith believe.” Wynne, 376 F.3d at 301.
Nor was the December 17 prayer the exception, rather than the rule, as our friend in dissent suggests. Post at 361-62. December 17 was of course the day Joyner and Blackmon chose to attend a Board meeting and heard the sectarian opening prayer. But the day was hardly unusual. As the magistrate judge found, “[t]he undisputed record shows that the prayers delivered at the outset of Board meetings from May 29, 2007 through December 15, 2008 referred to Jesus, Jesus Christ, Christ, or Savior with overwhelming frequency.” Almost four-fifths of the prayers contained such references. The prayers closed — like the prayers in Wynne — with invocations to “the gracious name of the Lord Jesus Christ,” with references to “the merits of Jesus Christ, Thy Son and our Savior,” and with reminders that the prayers were “[i]n the blessed name of Jesus.” See Wynne, 376 F.3d at 294 (prayers closed with “In Christ’s name we pray”). The prayers before the policy *350 likewise featured a .substantial number of sectarian references.
Moreover, it is not the case, as the dissent suggests, that the prayers “were largely generic petitions to a Divine Being to bless the legislative body and request that it be guided to act wisely and justly in the interest of the citizens.” Post at 360. If that were true, this case would be quite different. But here there were many prayers that not only invoked Jesus’ name throughout, see, e.g., February 25, 2008 (beginning, “Father ... we thank you for your son Jesus Christ our redeemer, we thank you for the holy spirit who is our guidance and our counselor”); but also that both before and after the policy invoked specific tenets and articles of faith of Christianity, see, e.g., November 10, 2008 (opening with thanks to God “for the Lord Jesus Christ, the one that loved us and gave himself for us at Calvary”); February 12, 2007 (praying “oh Lord, our Lord, we thank you for your son Jesus who died on Calvary that we might have a life and have it more abundantly”). Taken as a whole, it is clear that the prayers offered under the Board’s policy did not “evoke common and inclusive themes and forswear ... the forbidding character of sectarian invocations.” Simpson, 404 F.3d at 287. Wynne and Simpson set forth the constitutional line, and these prayers crossed it.
rv.
The Board makes a number of arguments in defense of its policy. We shall address them in turn.
A.
First, the Board argues that we should decline to apply Wynne and Simpson. In its view, Wynne does not control this case because the prayers there were delivered by members of the town council. According to the Board, this factual distinction is dispositive, for while prayers delivered by government officials carry an “obvious and inherent risk” of affiliation, prayers delivered by “a wide pool of volunteer, self-selected citizens” will not show “the government’s allegiance to a particular sect or creed.” Appellant’s Br. at 22 (quotations and citations omitted). Similarly, the Board argues that Simpson is factually distinguishable because the county board there decided to artificially narrow the group of eligible religious leaders to “representatives of Judeo-Christian or monotheistic religions.” Id. at 23. While safeguards like nonsectarian messages and wide-ranging religious appeals were necessary in the presence of such editorial control, the Board argues that they are not required where, as here, the policy is “even more inclusive and completely unlimited.” Id. at 23-24.
These arguments miss the forest for the trees. With respect to Wynne, the Board is right to observe that the prayers were delivered by members of the town council. See Wynne, 376 F.3d at 294. But that fact was not dispositive. It was the governmental setting for the delivery of sectarian prayers that courted constitutional difficulty, not those who actually gave the invocation. Wynne rested on two pillars: the Supreme Court’s opinion in Marsh, which flatly declared that legislative prayer cannot “proselytize or advance any one ... faith or belief,” id. at 300 (quoting Marsh, 463 U.S. at 794-95, 103 S.Ct. 3330), and the Court’s subsequent clarification that the prayers in Marsh were constitutional “because the particular chaplain had removed all references to Christ,” id. at 299 (quoting Allegheny, 492 U.S. at 603, 109 S.Ct. 3086). Those principles apply with equal force here. And lest there be any doubt, we applied the same type of analysis in Wynne to the policy in Simpson, see *351 Simpson, 404 F.3d at 283-84, which featured prayers delivered by local clergy on a first-come, first-serve basis, see id. at 279.
The Board’s arguments regarding Simpson are equally unpersuasive. Once again, the important factor was the nonsectarian nature of the prayer, not the identity of the particular speaker. While the Board contends that Simpson’s discussion of the non-sectarian nature of the prayers was due to the county board’s decision to “specifically den[y] the intention to create an open forum for private speakers, and instead maintain! ] a degree of ‘content-control’ over what was said by the guests,” Appellant’s Br. at 23 (citation omitted), that fact was not central to Simpson’s holding in any way. Indeed, we never once mentioned that fact in analyzing whether the prayers met constitutional muster. See Simpson, 404 F.3d at 282-84. To the contrary, we applauded Chesterfield County for its “wide variety of prayers” and upheld those prayers because Chesterfield “aspired to non-sectarianism and requested that invocations refrain from using Christ’s name, or, for that matter, any denominational appeal.” Id. at 284. While no two cases are exactly alike, the Board has given us no convincing reason to depart from the holdings of Wynne and Simpson.
B.
Next, the Board argues that the district court misinterpreted Marsh, Wynne, and Simpson in deciding to “parse! ] the content of particular prayers,” Reply Br. at 23, and “impose a blanket censor upon prayer content,” Appellant’s Br. at 27. In its view, “various other courts have all interpreted this Circuit’s precedents very differently than the District Court below,” and the district court erred in “finding that the inclusion of sectarian references by guest invocation speakers in Forsyth County rendered the Board’s neutral invocations policy unconstitutional.” Id. at 30.
Likewise, the dissent claims that our holding requires “judicial bodies to evaluate and parse particular religious prayers.” Post at 356. This claim is ironic in view of the fact that the dissent engages in what can only be described as an extensive evaluative exercise designed to prove — against all evidence in the record — that the prayers in question were of a generic or nonsectarian character. We do not fault the dissent for undertaking its review, but only for attempting to decry that in which it is fully engaged. See post at 360-61.
It is true that Marsh stated that courts should not “parse the content of a particular prayer.” Marsh, 463 U.S. at 795, 103 S.Ct. 3330. This makes perfect sense. As a practical matter, courts should not be in the business of policing prayers for the occasional sectarian reference — that carries things too far. But the dissent gives the impression that virtually any review by the majority of the invocations under challenge would constitute impermissible “parsing.” Quite simply, this stark approach leaves the court without the ability to decide the case, by barring any substantive consideration of the very practice under challenge. It is to say the least an odd view of the judicial function that denies courts the right to review the practice at issue. For to exercise no review at all — to shut our eyes to patterns of sectarian prayer in public forums — is to surrender the essence of the Establishment Clause and allow government to throw its weight behind a particular faith. Marsh did not countenance any such idea.
In fact, the Marsh Court only endorsed such a hands-off approach in situations where “there is no indication that the prayer opportunity has been exploited to *352 proselytize or advance any one, or to disparage any other, faith or belief.” Id. at 794-95, 103 S.Ct. 3330. In other words, courts need to assure themselves that legislative prayer opportunities are not being exploited before they abdicate all constitutional scrutiny. The district and magistrate judges did just that by following precedent and making the determination that Marsh and this Circuit’s own decisions require.
That is precisely the approach we applied in Wynne. Rather than “parsing” the details of a particular prayer, we looked at the district court’s factual findings about the frequency with which the council “invoked ‘Jesus,’ ‘Jesus Christ,’ ‘Christ,’ or ‘Savior’ ” in determining whether the prayers actually did proselytize or advance a particular sect. Wynne, 376 F.3d at 298 n. 4. We took the same approach in Simpson as well, taking note of the “wide variety of prayers” and their “nonsectarian[ ]” nature. Simpson, 404 F.3d at 284. The district court here followed suit, relying on the magistrate’s findings about the “overwhelming frequency” of references to “Jesus, Jesus Christ, Christ, or Savior” in determining that the prayers did advance one particular faith.
Other circuits have adopted a similar perspective. For example, in Hinrichs v. Bosma, 440 F.3d 393 (7th Cir.2006), the Seventh Circuit declined to stay the district court’s ruling that the Indiana House of Representatives’ legislative prayer policy was unconstitutional. See Hinrichs, 440 F.3d at 395. Like the Forsyth County Board, the Indiana House invited clergy from all over the state to issue a prayer before each legislative session and encouraged the clerics to “strive for an ecumenical prayer.” Id. Nevertheless, many of the prayers featured “supplications to Christ”: they were “given ‘in Christ’s name,’ ‘through [Yjour Son Jesus Christ,’ [and] ‘In the Strong name of Jesus our Savior.’ ” Id. In concluding that a stay would be improper, the Seventh Circuit observed that the cases squarely confronting the constitutionality of “sectarian legislative prayer ... have concluded that Marsh prohibits the practice.” Id. at 399.* It also noted, as we do, that the Supreme Court’s opinion in Allegheny “read Marsh as precluding sectarian prayer.” Id.; see also Snyder v. Murray City Corp., 159 F.3d 1227, 1234 (10th Cir.1998) (“Thus, the kind of legislative prayer that will run afoul of the Constitution is one that proselytizes a particular religious tenet or belief, or that aggressively advocates a specific religious creed, or that derogates another religious faith or doctrine.”).
The Board, however, suggests that the Eleventh Circuit’s opinion in Pelphrey v. Cobb County, 547 F.3d 1263 (11th Cir.2008) compels a different result. In Pelphrey, the court upheld a legislative prayer policy adopted by two county commissions that allowed “volunteer leaders of different religions, on a rotating basis, to offer invocations with a variety of religious expressions.” Pelphrey, 547 F.3d at 1266. While the majority of prayer-givers were Christian, leaders of all faiths had come forth. See id. at 1277. The prayers themselves, in turn, had at times included “ordinarily ... brief’ sectarian terms, such as “references to ‘Jesus,’ ‘Allah,’ ‘God of Abraham, Isaac, and Jacob,’ ‘Mohammed,’ and ‘Heavenly Father.’ ” Id. at 1266. Based on these facts, the Eleventh Circuit concluded that there was no need to “evaluate the content of the prayers” because “the prayers of the County Commission *353 were not exploited to advance one faith or belief.” Id. at 1278. The Board argues that we should affirm its policy by analogy to Pelphrey, drawing from a sentence in the opinion stating that “Allegheny does not require that legislative prayer conform to the model in Marsh.” Appellant’s Br. at 29 (quoting Pelphrey, 547 F.3d at 1271-72).
But Pelphrey’s ruling does not provide the support the Board claims. In upholding the policy in Pelphrey, the Eleventh Circuit principally relied on the fact that “the prayers, taken as a whole, did not advance any particular faith.” Pelphrey, 547 F.3d at 1278. In other words, the Pelphrey court adopted the same approach we did in Wynne and Simpson: it determined as a threshold matter whether the invocations exploited the opportunity for legislative prayer. Indeed, the Eleventh Circuit made this point itself, observing that the “Fourth Circuit read[s] Marsh[] as we do.” Id. at 1273. It further noted that Wynne and Simpson had likewise focused their analysis on the threshold inquiry of whether or not the prayer opportunity had “been exploited to proselytize or advance” a particular faith. Id. at 1273 (quoting Marsh, 463 U.S. at 794-95, 103 S.Ct. 3330).
Such advancement did not take place in Pelphrey, where the “diverse references in the prayers, viewed cumulatively, did not advance a single faith.” Id. at 1277. But just such an advancement has taken place here. This policy was not, as the dissent would have it, “a pluralistic celebration of prayer,” post at 366, but an advancement of one religion. In practice, the Board’s policy resulted in a greater proliferation of sectarian prayer. Almost four-fifths of the prayers delivered after the adoption of the policy referenced Jesus Christ. None of the prayers mentioned any other deity. And at no time after the adoption of the policy did a non-Christian religious leader come forth to give a prayer. The record thus reflects that the prayers here, taken as a whole, “advance[d one] single faith” to the exclusion of all others. Pelphrey, 547 F.3d at 1277.
C.
Finally, the Board argues that its policy should pass muster because it is a neutral policy under which “all views and philosophies are equally welcomed.” Appellant’s Br. at 26. In its estimation, it is “difficult, if not impossible, to conceive of a more fair, neutral or inclusive invocation policy.” Id. at 27. In the Board’s view, the sectarian nature of the prayer here is simply a function of the “religious demographics of the communities” in Forsyth County. Reply Br. at 24. Because the Board “showed no favoritism or preference at any time between religious faiths,” its policy must be upheld. Appellant’s Br. at 27.
The Board is correct to observe that its policy is neutral. On its face, the policy states that it is “not intended, and shall not be implemented or construed in any way, to affiliate the Board with, nor express the Board’s preference for, any faith or religious denomination.” And we agree with the magistrate judge that the policy “does many things right,” such as “striv[ing] to include a wide variety of speakers from diverse religious faiths” and encouraging potential prayer leaders not to disparage other faiths.
But the policy, as implemented, is an altogether different matter. It is not enough to contend, as the dissent does, that the policy was “neutral and proactively inclusive,” post at 362, when the County was not in any way proactive in discouraging sectarian prayer in public settings. Unlike in Simpson, the Board’s policy did not require that invocations be “non-sectarian” and avoid “advancing] any one *354 faith or belief.” Simpson, 404 F.3d at 278. Moreover, while the Board’s policy itself states that it is “not intended ... to affiliate the Board with, nor express the Board’s preference for, any faith or religious denomination,” the letter it sends to the religious leaders actually giving the prayers sends a different message. The letter merely instructs them that the prayer opportunity should “not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker.” In other words, the letter focuses on only one part of the Marsh test — proselytizing—and contains virtually no language discouraging leaders from advancing them own faith. See Wynne, 376 F.3d at 300 (“ ‘[P]roselytize’ and ‘advance’ have different meanings and denote different activities.”).
On a broader level, and more importantly, citizens attending Board meetings hear the prayers, not the policy. What this means is that we cannot turn a blind eye to the practical effects of the invocations at issue here. The dissent suggests that the “frequency of Christian prayer” was merely the “product of demographics,” post at 363, and the County “could not control whether the population was religious,” id. What the dissent offers as a defense of the policy, however, is one of the problems with it. Take-all-comers policies that do not discourage sectarian prayer will inevitably favor the majoritarian faith in the community at the expense of religious minorities living therein. This effect creates real burdens on citizens- — particularly those who attend meetings only sporadically — for they will have to listen to someone professing religious beliefs that they do not themselves hold as a condition of attendance and participation. “To ... Jewish, Muslim, Bahá’i, Hindu, or Buddhist citizens[, ]a request to recognize the supremacy of Jesus Christ and to participate in a civic function sanctified in his name is a wrenching burden.” See Amicus Br. of American Jewish Congress et al. 8. Such burdens run counter to the essential promise of the Establishment Clause. See Larson, 456 U.S. at 244, 102 S.Ct. 1673.
This is not to say that the Board must abandon the practice of legislative prayer. Nor do we wish to set forth some sort of template for an ideal legislative prayer policy. After all, as we recognized in Simpson, “too much judicial fine-tuning of legislative prayer policies risks unwarranted interference in the internal operations of a coordinate branch.” Simpson, 404 F.3d at 286-87. The bar for Forsyth County is hardly a high one. Public institutions throughout this country manage to regularly commence proceedings with invocations that provide all the salutary benefits of legislative prayer without the divisive drawbacks of sectarianism. See id. at 287 (describing how Chesterfield County’s invocations sought “guidance that is not the property of any sect”). And religious leaders throughout this country have offered moving prayers on multitudinous occasions that have managed not to hurt the adherents of different faiths. In the end, the constitutional standard asks of the County no more than what numerous public and governmental entities already meet. Indeed, some of the prayers offered in this very case — albeit a minority — plainly met it.
As it stands now, however, the Board’s policy falls short. It resulted in sectarian invocations meeting after meeting that advanced Christianity and that made at least two citizens feel uncomfortable, unwelcome, and unwilling to participate in the public affairs of Forsyth County. To be sure, citizens in a robust democracy should expect to hear all manner of things that they do not like. But the First Amendment teaches that religious faith stands on *355 a different footing from other forms of speech and observance. Because religious belief is so intimate and so central to our being, government advancement and effective endorsement of one faith carries a particular sting for citizens who hold devoutly to another. This is precisely the opposite of what legislative invocations should bring about. In other words, whatever the Board’s intentions, its policy, as implemented, has led to exactly the kind of “divisiveness the Establishment Clause seeks rightly to avoid.” Id. at 284.
At no place does the dissent appreciate the impact of its view upon adherents of minority faiths who hear public meetings open with invocations given in the name of a faith to which they do not subscribe. By accusing the majority of “bowing ... to universal inoffensiveness,” post at 367, the dissent appears to dismiss Joyner’s and Blackmon’s sensitivities as essentially of no moment. This is not right. While it is true that plaintiffs were not coerced, they claim pressure to stand and bow their heads along with the rest or risk having their civic participation correspondingly devalued. And these plaintiffs are not so different from other citizens who may feel in some way marginalized on account of their religious beliefs and who decline to risk the further ostracism that may ensue from bringing their case to court or who simply lack the resources to do so. While the dissent insists that “[t]he Establishment Clause does not protect against feelings of ostracism or marginalization,” id. at 361, it surely is solicitous of harms visited upon citizens by government’s advancement of a particular faith. We may not know what subtle or not-so-subtle pressures non-Christian citizens of the County felt to participate in the sectarian exercise. We do know, however, that citizens should come to public meetings confident in the assurance that government plays no favorites in matters of faith but welcomes the participation of all.
V.
George Washington once observed that “[rjeligious controversies are always productive of more acrimony and irreconcilable hatreds than those which spring from any other cause.” Letter from George Washington to Edward Newenham (June 22, 1792). As our nation becomes more diverse, so also will our faiths. To plant sectarian prayers at the heart of local government is a prescription for religious discord. In churches, homes, and private settings beyond number, citizens practice diverse faiths that lift and nurture both personal and civic life. But in their public pursuits, Americans respect the manifold beliefs of fellow citizens by abjuring sectarianism and embracing more inclusive themes. That the Board and religious leaders in Forsyth County hold steadfast to their faith is certainly no cause for condemnation. But where prayer in public fora is concerned, the deep beliefs of the speaker afford only more reason to respect the profound convictions of the listener. Free religious exercise posits broad religious tolerance. The policy here, as implemented, upsets the careful balance the First Amendment seeks to bring about.
The judgment of the district court is hereby

AFFIRMED.

 In a later opinion, the court concluded that the appellants lacked standing. See Hinrichs v. Speaker of the House of Representatives of the Ind. Gen. Assembly, 506 F.3d 584, 585 (7th Cir.2007).