DIANA GRIBBON MOTZ, Circuit Judge,
concurring:
I concur in full with the majority opinion. I write separately to emphasize,that our decision today fully comports with Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), Town of Greece v. Galloway, — U.S. —, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014), and the history pf the Establishment Glause itself.
I.
The Constitution forbids a legislative body from using its prayer opportunity to advance one religion or set of religious beliefs to the exclusion of others. See Town of Greece, 134 S.Ct. at 1823; Marsh, 463 U.S. at 794-95, 103 S.Ct. 3330. This rule derives from “[t]he clearest command of the Establishment Clause,” namely, “that one religious denomination cannot be officially preferred over another.” Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). The most obvious way to .show a preference for one religion is publicly to profess faith in its teachings. The Constitution fiercely protects this type of expression by individual citizens. But for the government, -the Constitution absolutely forbids it. See, e.g., Epperson v. Arkansas, 393 U.S. 97, 103-04, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).
This remains the law, and neither Marsh nor Town of Greece exempts prayer made before a legislative body from this rule. Rather, those cases simply hold that a legislative body may participate in some limited forms of religious activity without officially taking sides or appearing to do so.
In Marsh, the Supreme Court concluded that the Nebraska Legislature did not abandon official neutrality by employing a chaplain of one particular religious denomination to invoke divine guidance before a legislative session. See 463 U.S. at 793-95, 103 S.Ct. 3330. In so holding, the Court rightly- deferred to the Framers’ judgment about this type of government involvement with religion. See id. at 790-91, 103 S.Ct. 3330. However, the Marsh Court plainly did not abandon or make an exception to the Establishment Clause’s basic commits ment to, neutrality. Instead, the Court ultimately approved the Legislature’s practice because it found “no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief.” Id. at 794-95, 103 S.Ct. 3330.
In Town of Greece, the Court held that a legislative body’s chaplain-led prayer could include sectarian content. 134 S.Ct. at 1823. Thus, the town board in that case did not impermissibly prefer one religion over another simply because volunteer chaplains spoke in a particular religious idiom. To hold otherwise, the Court reasoned, would require legislátures and courts to “act as supervisors and censors of religious speech,” which would entangle government with religion far more than a rule allowing a prayer-giver to draw on his private religious beliefs. Id. at 1822. Reviewing the town’s practice as a whole, the Court concluded that no other features- of the town’s rotating system of volunteer chaplains, all recruited in a non-discriminatory manner from local congregations, advanced one religion to the exclusion of others. See id. at 1824.
Thus, Marsh and Town of Greece provide a guidepost for resolving the case at hand. If the Board’s practice sends the message that it prefers or accepts the teachings of one religion over others, it *293 violates the Constitution. If the practice simply allows a prayer-giver to espouse his own private religious beliefs when helping to solemnize the Board’s meetings, it does not.
Of course, resolving whether a given practice violates the Establishment Clause requires us to engage in a sensitive “interpretation of social facts.” Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 315, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (quoting Lynch v. Donnelly, 465 U.S. 668, 694, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O’Connor, J., concurring)). Yet some clear boundaries exist. For example, neither Marsh, nor Town of Greece, nor any other case suggests that a legislative body may begin each and every one of its meetings by reciting a particular religion’s creed. It does not matter whether that creed is the Shahada of Islam, the Triple Gem of Buddhism, a recitation from the Vedas or other shruti sacred to Hinduism, the Wiccan Rede, the Shema Yisrael of Judaism—or the Apostle’s Creed of Christianity.
If members of a legislative body recited one religion’s creed month after month, year after year, allowing no opportunity for members of any other religion to lead a prayer, a reasonable observer could only conclude that the legislative body preferred that religion over all others. See Engel v. Vitale, 370 U.S. 421, 430, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (“There can be no doubt that New York’s state prayer program officially establishes the religious beliefs embodied in the Regents’ prayer,” even though the prayers were optional for students.). If a practice- like this does not violate the Establishment Clause, nothing would prevent that legislature from passing a statute, ordinance, or resolution-declaring a particular faith the true religion. No principled distinction exists between a legislative body’s proclaiming, for example, Christianity’s status as the one true religion irt a written instrument and professing-that it is so—over and over again with no room for an alternative viewpoint— during public. meetings. Both constitute state action. See Turner v. City Council of Fredericksburg, 534 F.3d 352, 354-55 (4th Cir. 2008) (O’Connor, J.). And both convey the message of government preference for one religion over all others.
In this case, for all the reasons set forth in the majority opinion, the Board’s practice sends the same message as the Apostle’s Creed. The undisputed record evidence renders untenable Rowan County’s contention that the Commissioners were simply espousing their own personal religious beliefs. In over five years, the Board made no disclaimers and adopted no official policies to that effect.- Moreover, the prayers themselves were typically phrased using first-person plural pronouns like “we” and “our,” undermining any suggestion that the prayers were simply personal petitions. Nor is the conclusion Rowan County would have us draw apparent from the overall context of the prayers. In sum, nothing about the Board’s practice would lead a reasonable observer to conclude that the Commissioners spoke only as individuals, rather than speaking for the legislative body representing the . people of Rowan County. Cf. Joyner v. Forsyth Cty., 653 F.3d 341, 344 (4th Cir. 2011) (noting the board’s formal written policy that its prayers were “not intended ... to affiliate the Board with, nor express the Board’s preference for, any faith or religious denomination”).
Given the Commissioners’ role in the prayer practice, the exclusivity of those prayers, the uniformity of the Christian message found in nearly every prayer, the frequency of these sectarian prayers, the degree of sectarian content in the prayers, the long duration of the prayer practice, and the reactions to the objections of non- *294 Christian residents, a reasonable observer would conclude that the Board had placed its imprimatur on Christianity. In fact, a reasonable observer could not conclude otherwise.
II.
Nor can the historical practice of the First Congress save the Board’s practice. Of course, to the extent we can discern it, the Framers’ understanding, of what constitutes permissible religious activity by the government serves as highly probative evidence of what the Establishment Clause allows and what it forbids. See Marsh, 463 U.S. at 790-91, 103 S.Ct. 3330. Courts consider the Framers’ understanding probative because they drafted the First Amendment and sent it on to the states for ratification. As such, it is unlikely that the Establishment Clause forbids a practice the First Congress engaged in or permits a practice it eschewed. For this very reason, the Marsh Court found it significant that the First Congress employed chaplains to deliver opening prayers, explaining that “[i]t can hardly be thought” the Framers “intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable.” Id. at 790, 103 S.Ct. 3330.
Study of the practice of the First Congress thus serves as a useful interpretive tool in legislative prayer cases, but this tool can easily be misused. One way to misuse it is to claim that a practice dating back to the First Congress justifies a significantly different modern practice. That is precisely what Rowan County and its supporting amici attempt to do here. They shoehorn the legislator-led prayer at issue in this case into the tradition begun by the First Congress. But examination of the practice of the First Congress shows that it provides no support at all for the Board’s prayer practice. Rowan County and its supporting amici do not cite a single authority suggesting that the First Congress engaged in a practice similar to the one at issue—that is, having one of its own members deliver the opening prayer. Perhaps most notably, my dissenting colleagues cannot cite any such authority either.
This stands to reason. A search of the Journals of House and Senate from 1789 to 1791, the official contemporaneous records of the proceedings in the First Congress, and the Annals of Congress, which were compiled later from the best available sources from that time period, does not yield even one example of legislator-led prayer during the First Congress. The Framers apparently relied exclusively on chaplain-led prayer to solemnize their proceedings. Of course, this does not establish that legislator-led prayer is unconstitutional, but it does preclude any argument that legislator-led prayer must be constitutional because the First Congress approved of it.
Rather than cite historical evidence that is truly probative of the meaning of the Establishment Clause, the principal dissent relies on recent instances of legislator-led prayer in Congress, none of which occurred before 1973; the contemporary practices of state and local legislatures; the practice of the South Carolina Provincial Congress; and a vague, citation-free statement from the late Senator Robert C. Byrd that senators have given the opening prayer “from time to time.” See 2 Robert C. Byrd, The Senate 1789-1989: Addresses on the History of the United States Senate 305 & 647 n.17 (Wendy Wolff ed., 1991) (citing two resolutions as support for a different proposition). In the historical analysis endorsed by the Marsh Court, this is very thin gruel. And it is certainly no substitute for the Framers’ own practice and understandings.
*295 Furthermore, the limits the Framers imposed on their own practice of chaplain-led prayer provide significant evidence of what they believed to be the dividing line between permissible and impermissible legislative prayer. By the standards of an overwhelmingly Protestant society, the First Congress took pains to ensure that its own legislative prayer practice remained religiously neutral, both in appearance and in practice. As one of its very first orders of business, the House and Senate formed committees “to take under consideration the manner of electing Chaplains.” S. Journal, 1st Cong., 1st Sess. 10 (1789). On April 15, 1789, the Senate committee reported back with a proposed resolution:
That two Chaplains, of different denominations, be appointed to Congress, for the present session, the Senate to appoint one, and give notice thereof to the House of Representatives, who shall, thereupon, appoint the other; which Chaplains shall commence their services in the Houses that appoint them, but shall interchange weekly.
Id. at 12 (emphases added); see also Marsh, 468 U.S. at 793 n.13, 103 S.Ct. 3330. The Senate adopted the resolution, S. Journal, 1st Cong., 1st Sess. 12 (1789), and the House concurred two days later, H.R. Journal, 1st Cong., 1st Sess. 16 (1789). The Senate went on to elect Samuel Provoost, an Episcopalian bishop, as its first chaplain, and the House in turn elected William Linn, a Presbyterian minister. S. Journal, 1st Cong., 1st Sess. 16 (1789); H.R. Journal, 1st Cong., 1st Sess. 26 (1789).*
This history surely reflects the Framers’ concern with avoiding even a suggestion that Congress subscribed to the tenets of a single religion. I can discern no other reason why the House and Senate would have bound themselves to select chaplains of different denominations and to rotate their chaplains so often. The Framers understood that legislative prayer, even when led exclusively by chaplains, can be just as dangerous as other forms of government-sponsored religious activity unless measures are taken to avoid a sectarian preference, or even the appearance of one.
The Board’s practice in the case at hand simply does not fit the tradition of legislative prayer the First Congress began. In the aggregate, the Board’s practice amounts to an advancement of the tenets of a preferred religion. The members of the First Congress, who were far less acquainted with religious diversity than we are today, managed to avoid this, and they fashioned their own prayer practice to do so. Surely, Rowan County can do the same.
III.
The Supreme Court has not disavowed the fundamental rule that a legislative body may not use its prayer opportunity to promote or affiliate itself with one religion to the exclusion of others. If the Board’s practice does not violate this rule, then I cannot imagine what does.
Judge Keenan and Judge Harris have authorized me to indicate that they join in this concurring opinion.

This rule stood without interruption for the next sixty-one years. Along the way, Congress rejected proposals that would have omitted or specifically struck the "of different denominations” language in 1800, 1810, 1845, 1846, and 1847. S. Journal, 6th Cong., 2d Sess. 109 (1800); S. Journal, 11th Cong., 3d Sess. 526 (1810); H.R. Journal, 11th Cong., 3d Sess. 441 (1810); H.R. Journal, 29th Cong., 1st Sess. 72 (1845); H.R. Journal, 29th Cong., 2d Sess. 52 (1846); H.R. Journal, 30th Cong., 1st Sess. 59 (1847).