*296 NIEMEYER, Circuit Judge,
with whom Judge SHEDD joins, dissenting:
I am pleased to concur in Judge Agee's fine opinion, which carefully and faithfully applies the Supreme Court’s recent decision in Town of Greece v. Galloway, — U.S. —, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014). I write separately to focus on how the majority opinion, beyond simply sidestepping Town of Greece, actively undermines the appropriate role of prayer in American civic life. While it pays lip service to controlling law, it nonetheless seeks to avoid it and to reinstate instead the holding in Joyner v. Forsyth County, 653 F.3d 341 (4th Cir. 2011), which was squarely overturned by Town of Greece.

I

In finding Rowan County’s prayer practice unconstitutional, essentially because the prayers were sectarian, the majority opinion’s reasoning strikes at the very trunk of religion, seeking to outlaw most prayer given in governmental assemblies, even though such prayer has always been an important part of the fabric of our democracy and civic life.
The history of prayer practice in governmental assemblies is well documented both by the Supreme Court in its decisions in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), and Town of Greece and by the amicus brief submitted in this case by several States,which’ demonstrates that the practice is an important reflection of the values underlying both the Free Exercise and Establishment Clauses of the U.S. Constitution. By ignoring these values, the majority is able to mischaracterize and thus misapply those constitutional provisions.
The majority’s most basic error is its underlying assumption that the Establishment Clause is an anti-religion clause that exists in tension with the Free Exercise Clause. This, -however, misunderstands the Establishment Clause’s role. In his seminal book on the subject, Philip Hamburger details how the Establishment Clause was actually included in the Constitution to enhance the free exercise of religion by prohibiting establishments that favored one religion to the detriment of others:
These established churches (Episcopal in the southern states and Congregationalist in most New England states) were established through state laws that, most notably, gave government salaries ’to ministers on account of their religion. Whereas the religious liberty demanded by most dissenters was a freedom from the laws that created these establishments, the separation of church and state was an old, anticlerical, and, increasingly, antiecclesiastical conception of the relationship between church and state. As might be expected, therefore, separation was not something desired- by most religious dissenters or guaranteed by the First- Amendment. Indeed, it was quite distinct from the religious liberty protected in any clause of an American constitution, whether that of the federal government or that of any state.
* * *
The religious dissenters who participated in the campaign against establishments and whose claims seem to have affected the wording of the constitutional guarantees against establishments made demands for a religious liberty that limited civil government, especially civil legislation, rather than for a religious liberty conceived as a separation of church and state. Moreover, in attempting to prohibit.the civil legislation that would establish religion, they sought to preserve the power of government to legislate on religion in other ways.
*297 Philip Hamburger, Separation of Church and State 10, 107 (2002).
Hamburger thus details how the Establishment Clause was designed to enable the presence of religion in civic life without impairing the religious diversity central to the Republic. This is a far different understanding than that assumed by the majority, in which the Establishment Clause is designed to erect barriers around public life through which expressions of faith are not allowed. The majority seems to understand religious freedom as freedom from religion, not as the freedom to practice religion openly in all aspects of American life.
The free exercise of religion, including prayer practice, as enhanced by the prohibition of establishments, has been recognized as profoundly important to the vitality of American democracy and liberty—an important aspect of the Founders’ genius. In his magnum opus Democracy in America, Alexis de Tocqueville observed about America in the 1830s:
[A] democratic and republican religion ... contributed powerfully to the establishment of a republic and a democracy in public affairs; and from the beginning, politics and religion contracted an alliance which has never been dissolved.
1 Alexis de Tocqueville, Democracy in America at 311 (Henry Reeve trans., Vintage Books 1960) (emphasis added). Tocqueville explained the benefit of the relationship, observing that “despotism may govern without faith, but liberty cannot. Religion is much more necessary in the republic ... than in the monarchy.” Id. at 318. The theoretical basis underpinning this observation was that “religion sustains a successful struggle with that spirit pf individual independence which is her most dangerous opponent.” 2 id. at 29.
And this deeply grounded balance of democracy, religion, and freedom is well recognized in our jurisprudence, as eloquently and unambiguously related in Supreme Court cases. For instance, in Marsh v. Chambers, when the Court evaluated the practice of legislative prayer, its analysis was rooted in the Founders’ recognition of the practice’s value. The Court observed, “The opening of sessions of legislative and other deliberative public bodies with prayer is deeply, embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom.” Marsh, 463 U.S. at 786, 103 S.Ct. 3330 (emphasis added). In light of this history, the Court accepted “the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer.” Id. at 791, 103 S.Ct. 3330. It concluded that “there can be no doubt that the practice of opening legislative sessions with prayer has bécomé part of the fabric of our society.” Id. at 792, 103 S.Ct. 3330 (emphasis added).
In Town of Greece, the Court echoed these sentiments, stressing the value of faith expression in public life. As the Court recognized, “That the First Congress provided for the. appointment of chaplains only days after approving language for the First Amendment demonstrates that the Framers considered legislative prayer a benign acknowledgment of religion’s role in society.” Town of Greece, 134 S.Ct. at 1819 (emphasis added). The Court stated that any test under the Establishment Clause “must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change.” Id. After all, any “test that would sweep away what has so long been settled would create new controversy and begin anew the very divisions along *298 religious lines that the Establishment Clause seeks to prevent.” Id.
Simply put, there is no ambiguity in the historical role and importance of legislative prayer in civic life. In both Marsh and Town of Greece, the Court was entirely clear about this. And, in each case, the Court took pains to mention that the Establishment Clause was intended to protect, rather than constrain, public expression of religious faith.
The majority refuses to recognize the importance of religion—and of legislative prayer in particular—to democracy and American civic life. And its decision to “pay close attention to the interplay between the various facets of the County’s prayer practice” to assess whether it is too sectarian, ante at 281, unwisely inserts government into the role of regulating faith expression in precisely the way the Establishment Clause was intended to forbid. To be sure, prayer practice can be misused, rendering it unprotected, when it denigrates or interferes, with the religious practice of others. But short of those abuses, it ought not to be subject to the scrutiny and skepticism with which it is met by the majority. The proper respect for a practice so venerated and important to our democratic order does not include the niggling of civil courts assessing whether the practice “pointedly” invokes a particular name of the Divine to bless and solemnize the governmental proceeding. Ante at 271-72. In carrying out its self-assigned mission to police Rowan County’s prayer practice, the majority turns its back on the historical role and values of religion and prayer, as well as the principles of Town of Greece, and recasts the law and facts to serve its mission.
II
In order to advance its theory of the Establishment Clause, the majority opinion brushes past Town of Greece through an attempt to distinguish it. This effort relies on the distinction that the case before us involves invocations given by the legislators, while Town of Greece involved prayers given by chaplains, and then concludes casually that this difference takes this case “well outside the confínes of Town of Greece.” Ante at 280. Having found that handle, the majority then considers itself absolved of precedent and free to launch its own freestanding analysis.
A closer look at the distinction of which the majority makes so much, however, demonstrates that its analysis is nothing but a loosely disguised rationalization adopted to open the way to its new approach. The fact that the prayer-giver in Rowan County was a commissioner, not a minister designated or hired by the Board of Commissioners, resonates with nothing in Town of Greece, nor has anything outside of the majority opinion itself ever suggested that the status of the person giving an invocation is material to the constitutional analysis. Indeed, the Court has never specified which individuals are allowed to pray publicly. On the contrary, both Marsh and Town of Greece teach that the purpose of legislative prayer “is largely to accommodate the spiritual needs of lawmakers,” Town of Greece, 134 S.Ct. at 1826. It is thus not surprising that the historical facts of the long-standing tradition of prayer practice at governmental assemblies show that prayer-givers can include governmental officials or members of the assembly. In the U.S. Congress, for example, prayers have been given not only by the hired Chaplain, but also by Members of Congress. Similarly, the amicus brief filed by the States shows that a majority of state and territorial legislators rely on lawmaker-led invocations. And they show the same is true for local governments, where the practice of govern *299 ment officials giving the invocations is widespread.
The majority’s pro forma distinction of Town of Greece can only be driven by its desire to reach a different end, because the nature of Rowan County’s prayer practice is, in all aspects of plaintiffs’ complaints, virtually indistinguishable from the practice upheld by the Supreme Court in Town of Greece. As Judge Agee shows in detail, Town of Greece upheld the prayer practice in the context of a small local political assembly, as is the case here; Town of Greece upheld prayers primarily invoking Jesus and other Christian elements, as is the case here; Town of Greece upheld the request to stand for prayer, as is the case here; and Town of Greece rejected the complaints about the prayers being “offensive, intolerable, and an affront to a diverse community,” 134 S.Ct. at 1817 (internal quotation marks omitted), as made by the plaintiffs here. The Town of Greece Court also rejected the argument, which the majority embraces here, that it was the totality of these elements that offended the Establishment Clause.
To advance its mission under the banner of the Establishment Clause, the majority opinion also spins the facts to suggest that Rowan County is, through some unwritten agreement of its Commissioners, coercing its citizens to pray Christian prayers. It states that the prayer practice was designed “to identify the government with Christianity”; that the five Commissioners “maintained exclusive and complete control over the content of prayers”; that the Commissioners agreed on the prayer “featuring but a single faith”; and that the prayer was “pointedly sectarian.” Ante at 272, 274, 280, 272 (emphasis added and citations omitted). The record, however, simply does not support any such suggestion of coercion, exclusion, or agreement.
Rather, under the practice of Rowan County, as set forth in the record, one of the five Commissioners, in rotation, gives a brief invocation according to that Commissioner’s individual discretion, without any prestanding instruction or understanding about the content or nature of the invocation. Each Commissioner has affirmed by affidavit that the nature and composition of the invocation—or indeed a moment of silence—is left entirely to the discretion of the Commissioner and that there is no policy—written or unwritten—“regarding the form or content of any commissioner’s Invocation.” And each has stated that the invocation is given “for the edification and benefit of the commissioners and to solemnize the meeting.” The fact that the prayers were Christian in nature only reflected each prayer-giver’s religion, not some design, policy, or agreement of the Compiis-sioners.
Thus, evading the lessons of Town of Greece and armed with recharacterized facts, the majority conducts its own analysis, based in large part on isolated quotations from the author’s own opinions, either in dissent or overruled, or from the very district court opinion it is reviewing in this case. This approach amounts simply to a barely disguised disagreement with the Supreme Court’s support of sectarian legislative prayer in Town of Greece.

III

The reason behind the majority’s wayward approach is not a total mystery. Judge Wilkinson, writing for the majority, and the ACLU, representing the plaintiffs, have acted with harmonious parallelism, both having sought to circumvent the application of Town of Greece, and to return to the principles of Joyner v. Forsyth County, which Town of Greece overruled.
*300 In February 2012, the ACLU complained to the Rowan County Commissioners about the “practice of convening Board meetings .with sectarian prayer, particularly. Christian prayers," (emphasis added), and, to support its position, quoted Judge Wilkinson’s opinion in. Joyner, which held that legislative prayer is appropriate “only when it is nonsectarian,” 653 F.3d at 345, and that, in order to embrace a nonsectarian ideal, States and local governmental entities must be “proactive in discouraging sectarian prayer in public settings,” id. at 353 (emphasis added). Then, shortly after the decision in Town of Greece was handed down, the ACLU announced, “This morning, the Supreme Court issued a disappointing and troubling decision upholding a town board’s practice of opening its meetings with Christian prayers.” Heather L, Weaver, Supreme Court Turns Blind Eye to Exclusionary Prayers at Government Meetings, ACLU (May 5, 2014, 2:57 PM), https:// perma.cc/2UGE-5TNL.
Similarly, in his dissent in this case from the panel’s application of Town of Greece to uphold Rowan County’s prayer practice, Judge Wilkinson lamented that the prayers in, this case were “uniformly sectarian, referencing one and only one faith.” 837 F.3d 407, 431 (4th Cir. 2013) (Wilkinson, J., dissenting) (emphasis added). He continued, “I have seen nothing like it,” id., even though Toivn of Greece explicitly upheld uniformly sectarian prayer made in the tradition of only one faith. In this dissenting opinion, Judge Wilkinson essentially sought to return to his own earlier opinion in Joyner, where he had held that opening a meeting with sectarian prayer violated the Establishment Clause because the prayers “referred to Jesus, Jesus Christ, Christ, or Savior with overwhelming frequency.” Joyner, 653 F.3d at 349 (internal quotation marks omitted). His panel dissent thus concluded that, “[t]he desire of the opening realized in Lund, 837 this fine county for prayer at of its public sessions can be nondenominational prayer..” Lund, 837 F.3d at 437 (Wilkinson, J., dissnting) (emphasis added) (adopting the ACLU’s position that sectarian prayer was unconstitutional). But again, these very conclusions were overruled in Town of Greece, which upheld uniformly sectarian prayer' given at similar local governmental meetings.
The positions taken by the ACLU and Judge Wilkinson, while uncannily harmonious with each other, are starkly at odds with Town of Greece, relying on the very arguments rejected by the Supreme Court in both Marsh and Town of Greece. In Marsh, the Court rejected arguments based on the facts (1) that the legislative prayer was given by a qlergyman of only one denomination for 16 years; (2) that public .funds were used to pay for the services of the prayer-giver; and (3) that the prayers were in a single faith tradition. And in Town of Greece, the Court rejected arguments based on the facts (1) that the prayers were given disproportionately by Christians; (2) that this disparity effectively sponsored sectarian prayers, given predominantly in the name of Jesus; (3) that the prayer givers began by asking- the audience to stand and by saying, “Let us pray”; and (4) that the totality of the circumstances “conveyed the message that Greece was endorsing Christianity.” 134 S.Ct. at 1818. Reading the majority opinion here in light of Town of Greece, one could well believe that Justice Kagan’s dissent was in fact controlling.
* * *
At bottom, there simply is no constitutional defect in the prayer practice followed by Rowan County, and the majority’s effort to find it unconstitutional, despite Town of Greece, is, I respectfully suggest, aberrational.