RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0368p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

AMERICAN FREEDOM DEFENSE INITIATIVE;
PAMELA GELLER; ROBERT SPENCER,

          *Plaintiffs-Appellees*,

      *v.*

SUBURBAN MOBILITY AUTHORITY FOR
REGIONAL TRANSPORTATION (SMART);
JOHN HERTEL, individually and in his official
capacity as General Manager of SMART;
BETH GIBBONS, individually and in her
official capacity as Marketing Program
Manager of SMART,

          *Defendants-Appellants*,

GARY I. HENDRICKSON, individually and in
his official capacity as Chief Executive of
SMART,

          *Defendant*.

No. 11-1538

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-12134—Denise Page Hood, District Judge.

Argued: July 26, 2012

Decided and Filed: October 25, 2012

Before: ROGERS and KETHLEDGE, Circuit Judges; MARBLEY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Christian E. Hildebrandt, VANDEVEER GARZIA, P.C., Troy, Michigan, for Appellants. Robert J. Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, for Appellees. **ON BRIEF:** Christian E. Hildebrandt, John J. Lynch, VANDEVEER GARZIA, P.C., Troy, Michigan, Avery E. Gordon, Anthony Chubb, SUBURBAN MOBILITY AUTHORITY FOR REGIONAL TRANSPORTATION, for

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

Appellants.  Robert J. Muise, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, David Yerushalmi, LAW OFFICES OF DAVID YERUSHALMI, P.C., Chandler, Arizona, for Appellees.

————————————

**OPINION**

————————————

ROGERS, Circuit Judge.  Plaintiff American Freedom Defense Initiative is a nonprofit corporation that wanted to place an advertisement on the side of city buses in Michigan.  The advertisement read:  "Fatwa on your head?  Is your family or community threatening you?     Leaving Islam?     Got Questions?     Get Answers! RefugefromIslam.com".     Defendant Suburban Mobility Authority for Regional Transportation (SMART) refused to display the advertisement, citing its policy prohibiting content that is political or that subjects any group to scorn.  Upon learning of the rejection, plaintiffs sued SMART, claiming a First Amendment violation.  The district court granted a preliminary injunction, holding that plaintiffs likely could show that SMART's decision was arbitrary and capricious.  The injunction should not have issued, however, because plaintiffs are not likely to succeed in demonstrating that SMART unreasonably excluded this political speech from a nonpublic forum.

**I**

SMART, a state-run transit authority, operates public transportation throughout Michigan's four southeastern-most counties.  Through an exclusive agent, CBS Outdoor, Inc., SMART supplements its revenue by selling advertising space on its vehicles.  The advertising space is subject to SMART's "Restriction on Content" policy, which limits the permissible content of advertisements displayed on SMART vehicles.  The policy reads:

> In order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience, [SMART] shall not allow the following content:
>
> 1.      Political or political campaign advertising.

2.      Advertising promoting the sale of alcohol or tobacco.

3.      Advertising that is false, misleading, or deceptive.

4.      Advertising that is clearly defamatory or likely to hold up to scorn or ridicule any person or group of persons.

5.      Advertising that is obscene or pornographic; or in advocacy of imminent lawlessness or unlawful violent action.

CBS administers the SMART advertising program and makes the initial determination whether a proposed advertisement may fall into a prohibited category. CBS submits advertisements that fail this preliminary screening to SMART for review. SMART then makes the final determination whether the advertisement violates the content restrictions.

American Freedom Defense Initiative (AFDI) is a nonprofit corporation that "acts against . . . government officials, the mainstream media, and others" who "capitulat[e] to the global jihad and Islamic supremacism." AFDI promotes "its political objectives by, *inter alia*, sponsoring anti-jihad bus and billboard campaigns, which includes seeking advertising space on SMART vehicles." Compl. ¶¶ 6-8. Plaintiffs Pamela Geller and Robert Spencer are directors of AFDI, and "engage[] in political and religious speech through [A]FDI activities, including [A]FDI's anti-jihad bus and billboard campaigns."

In May 2010, AFDI tried to place the fatwa advertisement on SMART buses. CBS screened the advertisement and referred it to SMART for further review. SMART determined that the advertisement violated the content restriction against political advertising, as well as the restriction against content "likely to hold up to scorn and ridicule a group of persons."

AFDI sued for equitable relief, accusing SMART of violating the First and Fourteenth Amendments. The district court granted a preliminary injunction, enjoining SMART from applying its content restrictions to plaintiffs' speech. *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, No. 10-12134, 2011 WL 1256918, at *6 (E.D. Mich. Mar. 31, 2011). The court held that SMART's advertising space was a nonpublic forum, but that the content restrictions failed to provide adequate

guidance to decisionmakers about the difference between permissible and non-permissible advertisements.  The district court noted, as an example of this lack of guidance, that SMART had allowed an advertisement by the Detroit Coalition for Reason (the "atheist advertisement"), but disallowed the fatwa advertisement.  The atheist advertisement read: "Don't believe in God? You are not alone. DetroitCoR.org".  The district court found that this purportedly disparate treatment showed the absence of guidance.  SMART timely appeals.

## II

When considering a motion for a preliminary injunction, a district court must balance four factors:  "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818–819 (6th Cir. 2012).  Although a district court's decision whether to grant a preliminary injunction is generally reviewed for an abuse of discretion, *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007), in cases with First Amendment implications, the standard of review is *de novo*.  *Bays*, 668 F.3d at 819.  This is because "[w]hen First Amendment rights are implicated, the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002).  Put another way, in the First Amendment context, the other factors are essentially encompassed by the analysis of the movant's likelihood of success on the merits, which is a question of law that must be reviewed *de novo*. *Tenke Corp.*, 511 F.3d at 541.

## III

SMART's actions are reviewed for reasonableness and viewpoint neutrality because the advertising space created by SMART was a nonpublic forum.  We are

required to classify the forum under the Supreme Court's forum analysis, which courts use to determine "whether a state-imposed restriction on access to public property is constitutionally permissible." *United Food & Commercial Workers Union v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 349 (6th Cir. 1998).  It is undisputed that SMART's restrictions are state-imposed, *see* Mich. Comp. Laws § 124.403, and that the relevant forum is the advertising space on SMART's buses.  The analysis, therefore, turns on whether the advertising space is a traditional public, designated public, or nonpublic forum.  *United Food*, 163 F.3d at 349.  The forum type dictates the level of scrutiny applied to content-based restrictions like SMART's advertising rules.  *See Cornelius v. NAACP Legal Defense and Education Fund*, 473 U.S. 788, 800 (1985).  The parties agree that this case does not involve a traditional public forum.  In distinguishing between a designated public forum and a non-public forum, we focus on whether the government intentionally opened the forum for public discourse.  *See United Food*, 163 F.3d at 350.  We are guided not only by the government's explicit statements, policy, and practice, *id.,* but also by the "nature of the property and its compatibility with expressive activity to discern the government's intent." *Cornelius*, 473 U.S. at 802.

SMART's tight control over the advertising space and the multiple rules governing advertising content make the space incompatible with the public discourse, assembly, and debate that  characterize a designated public forum.  Although SMART's written policy does not explicitly identify the buses as a nonpublic forum, SMART's policy restricts the content of that forum.  SMART has banned political advertisements, speech that is the hallmark of a public forum.  Moreover, SMART has limited the forum by restricting the type of content that nonpolitical advertisers can display.  While reasonable minds can disagree as to the extent of the restriction—SMART has provided only three examples of excluded advertisements—the policy of exclusion has been exercised in a manner consistent with the policy statement.

The Supreme Court held that similar restrictions created a nonpublic forum in *Lehman v. City of Shaker Heights*, 418 U.S. 298, 299, 301–302 (1974).  The plaintiff in *Lehman* was a political candidate that sought to place political advertisements on "car

cards" on a city's transit vehicles. The *Lehman* Court held that advertising space sold on city buses was not a public forum because the city had rejected all political advertisements. The plurality reasoned that a ban on political advertisements was a "managerial decision to limit [advertising] space to innocuous and less controversial commercial and service oriented advertising." *Id.* at 304. The plurality noted that under a contrary holding, "display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician." *Id.* Justice Douglas, concurring to provide the fifth vote, was even more emphatic, quoting Justice Brandeis as follows:

> "[a]dvertisements of this sort are constantly before the eyes of observers on the streets and in street cars to be seen without the exercise of choice or volition on their part. Other forms of advertising are ordinarily seen as a matter of choice on the part of the observer. . . . In the case of newspapers and magazines, there must be some seeking by the one who is to see and read the advertisement. The radio can be turned off, but not so the billboard or street car placard."

*Id.* at 307-08 (Douglas, J., concurring), quoting *Packer Corp. v. Utah*, 285 U.S. 105, 110 (1932).

AFDI attempts to distinguish *Lehman* by relying on three cases in which courts have treated the exterior of city buses as designated public forums. However, in each of those cases, the courts held that a designated public forum existed because the transit authority had accepted most, but not all, political advertisements. In *United Food*, 163 F.3d at 352, the city had allowed a wide array of political and public speech on the side of its buses, including advertisements by political candidates for public office, but not advertising "of controversial public issues." We held that by allowing political advertisements, the city had opened the forum to the public; therefore, the city's rejection of controversial advertisements was subject to strict scrutiny:

> In accepting a wide array of political and public-issue speech, SORTA has demonstrated its intent to designate its advertising space a public forum. Acceptance of a wide array of advertisements, including political and public-issue advertisements, is indicative of the government's intent to create an open forum. Acceptance of political

and public-issue advertisements, which by their very nature generate conflict, signals a willingness on the part of the government to open the property to controversial speech, which the Court in *Lehman* recognized as inconsistent with operating the property solely as a commercial venture.

*Id.* at 355.  Similarly, in *New York Magazine v. Metropolitan Transportation Authority*, 136 F.3d 123, 129–30 (2d Cir. 1998), the Second Circuit held that the sides of New York City transit vehicles were a designated public forum "because the MTA accepts both political and commercial advertising."  The *New York Magazine* court reasoned that "[a]llowing political speech . . . evidences a general intent to open a space for discourse, and a deliberate acceptance of the possibility of clashes of opinion and controversy that the Court in *Lehman* recognized as inconsistent with sound commercial practice."  *Id.* at 130.   The court in the third case, *American Freedom Defense Initiative v. Metropolitan Transportation Authority*, No. 11 Civ. 6774, 2012 WL 2958178, at *14–16 (S.D.N.Y. July 20, 2012), held that it was bound by the *New York Magazine* decision because the same MTA policy was at issue.  SMART, by contrast, has completely banned political advertising, showing its intent to act as a commercial proprietor and to maintain its advertising space for purposes that indicate that the space is a nonpublic forum.

The fact that SMART allowed the atheist advertisement does not, as AFDI contends, demonstrate that the forum was open to political advertisements.  As the First Circuit has noted, "[o]ne or more instances of erratic enforcement of a policy does not itself defeat the government's intent not to create a public forum."  *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 78 (1st Cir. 2004).  Although SMART's practice of excluding advertisements is not as extensively documented as that in *Ridley*—there the transit authority had excluded seventeen advertisements—the reasoning is no less persuasive.  Because SMART's policy and practice demonstrate an intent to create a nonpublic forum, one purported aberration would not vitiate that intent.  In any event, the atheist advertisement could reasonably have been allowed by SMART as consistent with SMART's policy.  The advertisement could reasonably have been viewed as nonpolitical, as explained below.

The second part of the inquiry—the relationship between the restrictions and the purpose of the forum—also weighs in favor of finding that SMART created a nonpublic forum. SMART's advertisements are intended to boost revenue for the transit authority. SMART has stated that its policy of advertisement restrictions is intended to "minimize chance of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience." Allowing the discussion of politics would likely decrease SMART's revenue. For example, if a fast-food restaurant sold advertising space on the side of its store to a neo-Nazi political group for a campaign advertisement, the restaurant would be likely to lose business. Similarly, SMART's ridership likely would diminish were SMART to allow political advertisements. The reason for the restrictions ties directly to the purpose of the forum—raising revenue—and therefore indicates that SMART wanted to establish a nonpublic forum instead of opening the forum to the public. In short, though some municipal bus systems permit wide-ranging political advertisements, other bus systems need not.

## IV

Since the advertising space on SMART's vehicles is a nonpublic forum, the content restrictions imposed on that space are constitutional as long as they are reasonable and viewpoint neutral. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009). SMART could reasonably view the fatwa advertisement as falling within the prohibition against political advertisements, and AFDI is unlikely to succeed with its counterarguments that these rules are unconstitutional or merely a pretext for SMART's disagreement with AFDI's viewpoint.

First, SMART's prohibition of political advertisements appears reasonable and constitutional on its face. The reasonableness of a given restriction "must be assessed in the light of the purpose of the forum and all surrounding circumstances." *Cornelius*, 473 U.S. at 809. The reasonableness inquiry turns on "whether the proposed conduct would 'actually interfere' with the forum's stated purposes." *United Food*, 163 F.3d at 358 (quoting *Air Line Pilots Ass'n v. Dep't of Aviation*, 45 F.3d 1144, 1159 (7th Cir. 1995)). As discussed above, the policy serves a viewpoint-neutral purpose as in *Lehman*

and does not run afoul of the problems with the partial bans on political advertisements in *United Food* or *New York Magazine*. An outright ban on political advertisements is permissible if it is a "managerial decision" focused on increasing revenue to limit advertising "space to innocuous and less controversial commercial and service oriented advertising." *Lehman*, 418 U.S. at 304. It was reasonable for SMART to focus on longer-term commercial advertising in an effort to boost revenue instead of short-term political advertisements that might alienate riders. SMART reasonably concluded that permitting any political advertisement could interfere with the forum's revenue-generating purpose. It was generally permissible, in other words, for SMART to permit commercial and public service ads, but to turn down political ads.

Assuming this is so, it necessarily follows that such distinctions must be made on an ad-by-ad basis, and that some cases will be close. A commercial ad may have political overtones, such as the ad in the *New York Magazine* case, which read, "Possibly the only good thing in New York Rudy hasn't taken credit for." Determining the extent to which such an ad is political requires some judgment in marginal cases, with knowledge of the current political context, while in contrast a "Vote for Giuliani" ad clearly would be political and a "Buy New York Magazine" ad clearly would not. However, merely because it is sometimes unclear whether an ad is political does not mean the distinction cannot be drawn in the case of a nonpublic forum. The holding in *Lehman* demands that fine lines be drawn. Otherwise, as a practical matter, a nonpublic forum could never categorically exclude political speech.

This reasoning is consistent with *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969), which held unconstitutional ordinances that vested unbridled discretion in the hands of a government official or agency. *Shuttlesworth* was animated by the concern that unbridled discretion would give decisionmakers "substantial power to discriminate based on the content or viewpoint of the speech." *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 620 (6th Cir. 2009). To avoid the *Shuttlesworth*-discretion problem, ordinances "must contain precise and objective criteria on which [officials] must make their decisions; an ordinance that gives too much discretion to

public officials is invalid." *Id.* at 621 (internal quotation marks omitted). Put more succinctly, the rule may not be so vague that "a person of ordinary intelligence [could not] readily identify the applicable standard for inclusion and exclusion." *United Food*, 163 F.3d at 358–59. SMART's advertising rules guide officials in distinguishing between permissible and impermissible advertisements in a non-arbitrary fashion. The rule in question prohibits "[p]olitical or political campaign advertising." This directive is not so vague or ambiguous that "a person [could not] readily identify the applicable standard." *Id.* Although, as the district court noted, there were not additional guidelines that precisely define the term "political," there is no question that a person of ordinary intelligence can identify what is or is not political. On the margins, there may be some difficult determinations, on which reasonable people may disagree. However, eliminating all discretion is not required by *Shuttlesworth*. Whenever a rule is applied by an official, a certain amount of discretion must necessarily be exercised. While decisionmakers under SMART's policy may at times make incorrect determinations within their limited discretion, these errors are not the sort that *Shuttlesworth* intended to address. As discussed above, *Shuttlesworth* was concerned with the extent of the discretion and not with decisions made within the bounds of properly vested discretion. SMART's policies do not appear to have vested unbridled discretion in the decisionmakers in the manner contemplated by *Shuttlesworth*. That a different administrator may have ruled differently in a close case is not enough to invalidate the exclusion of political ads from a non-public forum.

Our court's decision in *United Food,* 163 F.3d at 352, does not compel a different conclusion. The transit authority in *United Food* sold bus advertising space, but disallowed advertising that was either aesthetically displeasing or that addressed "controversial public issues." *Id*. We found unbridled discretion had been vested in the decisionmakers because there was no articulated definitive standard to determine what was "controversial." This discretion allowed for the arbitrary rejection of advertisements based on viewpoint. By contrast, SMART's policy did not vest similar wide-ranging discretion in its employees. By adopting a blanket prohibition on political advertisements, SMART avoided the pitfalls of employee discretion presented by the

policy in *United Food.* A SMART employee must determine whether or not something is political—a reasonably objective exercise. In the *United Food* situation, however, the employee would have to determine where—on a hypothetical spectrum of controversy—an advertisement fell. The determination in *United Food* inherently would require a more subjective evaluation than the decision required under SMART's policies. Because of the difference between the two inquiries, SMART's policy does not create the same *Shuttlesworth* problem that plagued the policy in *United Food.*

## V

Because the ban on political advertising was permissible, it was reasonable for SMART to turn down the fatwa advertisement as political. Through the fatwa advertisement, AFDI seeks to oppose the perceived sanction of violence that AFDI believes threatens people in the United States. The plain language of the advertisement—"Fatwa on your head? . . . Leaving Islam?"—can well be read to suggest that Muslim-Americans who decide to leave Islam will be threatened or killed. The decision to place the advertisement in a Detroit suburb rather than in the Middle East indicates that the authors believe that such threats are present in the United States. To substantiate our understanding of the apparent message of the advertisement, we may look beyond the four corners to websites that the advertisement incorporates by reference. *See Ridley*, 390 F.3d at 74. A visit to the website listed in the Fatwa advertisement, RefugeFromIslam.com, confirms our understanding of the advertisement's message. The website is a blog that contains postings about both AFDI and an organization called "Stop Islamization of America." RefugeFromIslam.com (last visited October 23, 2012). The site also refers to conferences about "Islamic Law in America," accusations of threatened honor killings in the United States, and numerous other political issues.

Based on recent court cases, legislative actions, and political speeches, it was reasonable for SMART to conclude that the content of AFDI's advertisement—the purported threat of violence against nonconforming Muslims in America—is, in America today, decidedly political. The very idea of having Islamic law apply in the United

States has become one of political controversy. In *Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012), the court struck down a voter-approved amendment to the Oklahoma Constitution that would have forbidden courts from considering or using Sharia law. The Oklahoma legislature put the amendment on the ballot, and over seventy percent of voters approved. *Id.* at 1118. Legislatures in our own circuit have similarly addressed Sharia law: a bill proposed last year in the Tennessee Senate would have made any adherence to Sharia law a felony, punishable by up to fifteen years in prison. S.B. 1028, 107th Gen. Assemb., Reg. Sess. (TN 2011). The politicization of this issue is not confined to state legislatures. During the 2012 presidential primary, former candidate Newt Gingrich suggested a federal ban on Sharia law, stating, "I believe Sharia[ ]is a mortal threat to the survival of freedom in the United States and in the world as we know it." Scott Shane, *In Islamic Law, Gingrich Sees a Mortal Threat to U.S.*, N.Y. Times, Dec. 21, 2011, at A22. The existence of these positions in the political sphere—whether on ballots, in state legislatures, or in presidential primaries—could lead a reasonable person to conclude that the enforcement of Islamic law in America has become a political issue.

The reasonableness of SMART's conclusion is confirmed by the language that AFDI uses in its complaint. According to the complaint, AFDI "acts against the treason being committed by national, state, and local government officials . . . in their capitulation to the global jihad and Islamic supremacism." Compl. ¶ 7. The complaint explains that AFDI "promotes its political objectives by, *inter alia*, sponsoring anti-jihad bus and billboard campaigns, which includes seeking advertising space on SMART vehicles." *Id.* ¶ 8. By its own admission, therefore, AFDI sought to place advertisements on the SMART vehicle to "promote[] its political objectives." Moreover, by denying the placement of the fatwa advertisement, AFDI alleges that SMART "denied Plaintiffs' advertisement, and thus denied Plaintiffs access to a public forum to express their political and religious message." *Id.* ¶ 21. AFDI understood its own advertisement to contain a political message; therefore, it would be reasonable for SMART to read the same advertisement and reach the same conclusion.

Not only was the designation of the advertisement reasonable, it was also viewpoint neutral. As noted above, the AFDI advertisement expresses a political message aimed at curbing the perceived threat of Islamic law enforcement in the United States. The opposing viewpoint to AFDI's position is not that Islam is good—as AFDI appeared to suggest at oral argument—but rather either that Islamic law should be enforced against Muslims in the United States or that concerns about the enforcement of Islamic law in America are overblown. Either of these opposing views would be comparably political. The banned content here is the debate about enforcement of Islamic law in the United States, regardless of the viewpoint of the participants. Either side of the debate would reasonably be labeled political and the content could be restricted under SMART's policy.

AFDI contends that SMART's actions could not have been viewpoint neutral because SMART allowed the atheist advertisement but disallowed the fatwa advertisement. AFDI contends that because both advertisements discuss religion, SMART must have discriminated against the fatwa advertisement based on viewpoint. The analogy, however, does not hold. The atheist advertisement could be viewed as a general outreach to people who share the Detroit Coalition's beliefs, without setting out any position that could result in political action. The fatwa advertisement, however, addresses a specific issue that has been politicized. Two hypothetical changes to the advertisements demonstrate the difference. Had the atheist advertisement read, "Being forced to say the Pledge of Allegiance even though you don't believe in God? You are not alone. DetroitCoR.org," the advertisement would likely be political. The hypothetical advertisement would address an issue that has been politicized—requiring atheists to recite "under God," *see, e.g., Myers v. Loudoun Cnty. Pub. Schools,* 418 F.3d 395 (4th Cir. 2005)—and the advertisement would presumably not be permitted under SMART's policies. Similarly, had AFDI changed its advertisement to read, without more: "Thinking of Leaving Islam? Got Questions? Get Answers," SMART presumably could not ban the advertisement. These changes reflect differences in the two actual advertisements that a reasonable administrator, applying an objective standard, could identify.

Moreover, when SMART had been previously presented with advertisements that were both religious and political, it rejected them. The Pickney Pro-Life organization approached SMART with a proposed advertisement that depicted Jesus and stated, "Hurting after Abortion? Jesus, I trust you." Following the same procedure applied to the fatwa advertisement, CBS referred the matter to SMART for a final determination. SMART reasonably determined that the advertisement contained political speech regarding abortion, even though the advertisement also contained a religious message.

AFDI's reliance on the testimony of Beth Gibbons, a marketing manager for SMART, is misplaced. Gibbons testified that she saw "nothing about [the fatwa advertisement] itself that was political." She also testified that her opinion of the fatwa advertisement changed only after reading about the controversy surrounding the same advertisement in Miami, Florida. Gibbons stated: "I knew that [the fatwa advertisement] was of concern in that there is controversy on both sides of the issue on whether they should be posted." Even though Gibbons was designated as a Rule 30(b)(6) witness, a review of the transcript indicates that the above statements expressed Gibbon's personal opinion after she was shown the fatwa advertisement at the deposition. Gibbons was not the SMART official who ultimately found the advertisement to be political, and elsewhere she testified that SMART had rejected the advertisement because it was political.

## VI

Plaintiffs are thus not likely to succeed on the merits of their injunction suit. The other three factors in the preliminary injunction test have largely been considered in the preceding analysis.

AFDI alleges that it will suffer irreparable injury without the preliminary injunction, due to the continuing denial of its First Amendment rights. That argument is unpersuasive because the restrictions imposed on the use of a nonpublic forum are reasonable, viewpoint-neutral limits that do not deny AFDI its First Amendment rights. The injunction would also cause substantial harm to others, by compelling SMART to

post on its buses messages that have the strong potential to alienate people and decrease ridership.

Finally, the public interest would not be served by this preliminary injunction. While the public interest is promoted by the robust enforcement of constitutional rights, as well as by the healthy discussion of political issues in appropriate fora, none of these interests is degraded by the removal of this injunction. For the reasons discussed above, these interests remain undamaged because SMART's reasonable, viewpoint-neutral limits on the use of this nonpublic forum neither violate AFDI's constitutional rights nor prevent political discussion in public fora.

**VII**

The district court's grant of a preliminary injunction is reversed.