NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0667n.06

## No. 12-6079

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
*Jul 19, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| BRANDON RAYMOND JONES and THOMAS JOSEPH COLEMAN, III, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| HAMILTON COUNTY GOVERNMENT, TENNESSEE, | ) ) ) | |
| Defendant-Appellee. | ) ) | |

BEFORE:  GIBBONS and WHITE, Circuit Judges; and COHN, Senior District Judge.[*] [**]

**AVERN COHN, Senior District Judge.**  This is a First Amendment legislative prayer case. At issue is whether the Hamilton County Commission's (the "Commission") formal written policy of commencing meetings with a prayer invocation led by a private citizen violates the First Amendment's Establishment Clause.

The Commission, the elected legislature of Hamilton County, Tennessee, has a longstanding unwritten tradition of beginning its meetings with a prayer invocation.  On June 15, 2012, Plaintiffs-Appellants Brandon Jones and Thomas Coleman (the "Appellants"), both members of the

---

[*]  The Honorable Avern Cohn, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

[**]  We amend the caption as reflected in this opinion.

Chattanooga Freethought Association,[1] sued the Hamilton County Government (the "County") under 42 U.S.C. § 1983 seeking a declaratory judgment that the Commission's practice of opening meetings with a prayer invocation is unconstitutional. Appellants specifically objected to the Commission's use of prayers invoking "the name of Jesus." Subsequently, on July 3, 2012, the Commission formally adopted a resolution to commence Commission meetings with a prayer. Appellants sought from the district court a preliminary injunction enjoining the Commission's prayer practice; it was denied. This interlocutory appeal followed. For the reasons that follow, we affirm the district court's denial of a preliminary injunction. The Commission's prayer policy is constitutional on its face and an as-applied challenge[2] requires further fact-development on remand.

## I. BACKGROUND

### A. The Commission's Prayer Practice

The County is a political subdivision of the state of Tennessee. The Commission is the County's elected legislature and final policy maker. The Commission holds two types of meetings at which it conducts its official business: (1) agenda sessions; and (2) Commission meetings. These meetings begin with a prayer invocation, which is followed by the Pledge of Allegiance.

The parties stipulated that prior to July 3, 2012, "invocation speakers came from a variety of faith traditions, . . . and some speakers were invited by the County without knowing their faith

---

[1] The Chattanooga Freethought Association is a self-described "social, educational, and service organization for all atheists, agnostics, skeptics, and rational thinkers in the Chattanooga, TN and North Georgia area." Chattanooga Freethought Association, http://www.chattfreethought.com/ (last visited May 17, 2013). Its mission includes, among other things, to "defend and support the separation of church and state." *Id.*

[2] We use the term "as-applied challenge" to be consistent with the terminology used by the district court and the parties. However, by as applied, we are referring to the Commission's prayer policy as implemented, not merely as it is (or might be) applied against Appellants.

tradition. . . .″ Prayer invocations were offered by private citizens, local clergy, and the commissioners themselves.

The prayers were oftentimes Christian based. Amira Laham, a Muslim resident of the County who attended the Commission's meetings beginning in November of 2011, testified that she attended ten meetings, all of which began with Christian prayer invocations.

In May of 2012, the Freedom From Religion Foundation (the "Foundation")[3] sent a letter to the Commission requesting that the Commission discontinue all prayer before meetings. The letter stated, in pertinent part:

> It is our understanding that [the Commission's] meetings open with Christian prayers. We understand that the prayers are exclusively Christian and every 2012 prayer so far has been given in "Jesus' name."

> First and foremost, prayer at government meetings is unnecessary, inappropriate, and divisive. Commission members are free to pray privately or to worship on their own time in their own way. They do not need to worship on taxpayers' time. The Commission ought not to lend its power and prestige to religion, amounting to a governmental endorsement that excludes the 15% of the American population that is nonreligious (*American Religious Identification Survey*, 2008).

The Foundation recommended that the Commission "discontinue official, government prayers before government meetings" and instead incorporate a moment of silence.

The Commission continued its prayer practice despite the Foundation's request to substitute prayers with a moment of silence. For example, on June 6, 2012, County attorney Rheubin Taylor invoked the "Heavenly Father" and stated that the prayer was offered in "Jesus['] name." Again, on June 14, 2012, a Christian pastor recited the "Lord's Prayer," and some audience members—County employees and commissioners—stood and bowed their heads, while others chose

---

[3] According to its website, the Freedom From Religion Foundation "works as an umbrella for those who are free from religion and are committed to cherished principle of separation of state and church." About FFRF, http://ffrf.org/about (last visited May 17, 2013).

to recite the prayer aloud. Because of the continued prayer practice, Appellants filed suit on June 15, 2012.

The Commission continued its prayer practice after Appellants filed suit. On June 20 and June 28, 2012, prayer invocations were offered "in the name of Jesus." At the Commission's July 3, 2012 meeting, the invocation speaker recited the "Lord's Prayer," and all commissioners stood for the invocation. Some commissioners joined in reciting the prayer. On the same day, after the invocation, the Commission adopted Resolution 712-13: "A Resolution Adopting a Policy Regarding Opening Invocations Before Meetings of the Hamilton County Commission" (the "Policy"). The Policy expressly replaced and repealed "any prior practice of the . . . Commission concerning opening invocations. . . ."

The Policy allows "for an invocation, which may include a prayer, a reflective moment of silence, or a short solemnizing message, to be offered before [the Commission's] meetings for the benefit of the Commission." Participation is voluntary, both by members and employees of the Commission, and persons in attendance. The Policy provides that "[t]he prayer shall be voluntarily delivered by an eligible member of the clergy in Hamilton County, Tennessee."

To ensure that the eligible member of the clergy–the "invocation speaker"–will be chosen "from a wide pool of the County's clergy," the Policy sets forth a procedure for the Commission to select potential invocation speakers. Each year, the Commission is to "compile and maintain a database (the 'Congregations List') of the religious congregations with an established presence in Hamilton County." This will be done by "referencing the listing for 'churches,' 'congregations,' or other religious assemblies in Hamilton County." The Policy provides that "[a]ll religious congregations with an established presence in Hamilton County are eligible to be included in the Congregations List, and any such congregation can confirm its inclusion by specific written request

4

to the staff." Further, if a resident of the County attends a congregation in a different county, he or she can request the inclusion of that congregation. If a question arises "as to the authenticity of a religious congregation," the Policy states that the Commission "shall refer to criteria used by the Internal Revenue Service in its determination of those religious organizations that would legitimately qualify for I.R.C. § 501(c)(3) tax-exempt status."[4]

After the Congregations List is compiled, the Policy provides that, once a year, the Commission will mail to each congregation's religious leader an invitation to participate as the invocation speaker at the beginning of the meeting. The speaker does not receive compensation for his or her service. The letter informs the religious leaders that they will be scheduled to give the invocations on a first-come, first-serve basis.

The letter further provides guidance to religious leaders of the scope of their potential invocation by stating:

*This opportunity is voluntary, and you are free to offer the invocation according to the dictates of your own conscience. However, please try not to exceed no [sic] more than five (5) minutes for your presentation. To maintain a spirit of respect for all, the Commission requests only that the opportunity not be exploited as an effort to convert others to the particular faith of the invocation speaker, nor to disparage any faith or belief different than that of the invocation speaker.*

(emphasis in original).

However, the Policy does not control the content of invocations. Indeed, the Policy recognizes that "[n]o guidelines or limitations shall be issued regarding an invocation's content,

---

[4] To qualify for tax-exempt status under I.R.C. § 501(c)(3), an organization (1) must be "organized and operated exclusively for religious . . . purposes"; (2) must ensure that "no part of the net earnings . . . inure[] to the benefit of any private shareholder or individual"; (3) must ensure that "no substantial part of the activities" can be carried on as propaganda or otherwise influence legislation; and (4) cannot "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office."

except that the Commission shall request by the language of this policy that no invocation should proselytize or advance any faith, or disparage the religious faith or non-religious views of others, or exceed five (5) minutes in length." Further, "[n]either the Commission nor the staff shall engage in any prior inquiry, review of, or involvement in, the content of any invocation to be offered by an invocation speaker."

The Commission's published schedule of events issued prior to its meetings is to contain the following disclaimer:

> *Any invocation that may be offered before the official start of the Commission meeting shall be the voluntary offering of a private citizen, to and for the benefit of the Commission. The views or beliefs expressed by the invocation speaker have not been previously reviewed or approved by the Commission and do not necessarily represent the religious beliefs or views of the Commission in part or as a whole. No member of the community is required to attend or participate in the invocation and such decision will have no impact on their right to actively participate in the business of the Commission.*

(emphasis in original).

After the Policy went into effect, the Commission created the first Congregations List and mailed invitations to the religious leaders of 549 religious assemblies meeting within the County to give the invocation at future meetings. The list was compiled by referencing the Yellow Pages. The parties have stipulated that

> [t]he invitation was sent to many assemblies whose faith tradition is not discernible as well as many diverse identifiable faith traditions, including but not limited to Jewish, Muslim, Jehovah's Witness, Mormon, Christian Scientist, Catholic, Baptist, Presbyterian, Methodist, Lutheran, Church of Christ, Church of God, Pentecostal, Congregationalist, Episcopal, Nazarene, Seventh Day Adventist, Greek Orthodox, Assemblies of God, and Unitarian Universalist.

The majority of religious groups invited were Judeo-Christian, which corresponds with the majority of the County's residents.

6

## B. Post-Policy Prayers

At an evidentiary hearing in the district court,[5] Appellants introduced evidence of the Commission's prayer invocations at two meetings after the Policy went into effect. At the first meeting on July 12, 2013, Commission Chairman Henry "instructed the entire room to please stand" for the invocation, and the prayer asked for divine guidance and blessings on the Commission "in Jesus' name." Like the July 12 prayer, the July 18, 2013 prayer sought guidance "in the name of Jesus Christ, our savior, your son, and our only hope, in Jesus' name." According to Appellants, the prayers never changed from the time they began attending Commission meetings in June of 2012, *i.e.* they were Christian-based prayers invoking the name of Jesus.

In addition, since the Policy was adopted and applied, religious leaders from the following faith traditions have volunteered, and were scheduled to give the invocations on a first-come, first-serve basis: Jewish, Unitarian Universalist, Baptist, Lutheran, Church of God, Presbyterian, and others. At the time the district court issued its opinion on August 29, 2012, these scheduled invocation speakers had not yet participated at Commission meetings.[6] The record does not reflect whether the speakers actually participated by giving the invocation on the days they were scheduled to attend.

## C. The District Court's Decision

Appellants moved in the district court for a preliminary injunction to enjoin the Commission's prayer practice under the Policy. The district court, applying the four-prong preliminary injunction test discussed *infra*, denied Appellants' motion. Because Appellants sought

---

[5] The evidentiary hearing was held on July 26, 2012.

[6] Prayer invocation speakers were scheduled through November 29, 2012.

prospective relief through a preliminary injunction, the district court limited its inquiry to whether the July 3, 2012 Policy "is likely to result in a constitutional violation." Pre-Policy prayer invocations, therefore, were not considered.

The district court focused its analysis on Appellants' likelihood of succeeding on the merits. Appellants urged the district court, as they urge us, to apply *Lemon v. Kurtzman*, 403 U.S. 602 (1971).[7] The district court determined that *Lemon* did not apply to Establishment Clause challenges in the context of legislative prayer cases. In reaching this conclusion, the district court relied on the Supreme Court's decision in *Marsh v. Chambers*, 463 U.S. 783 (1983), and the decisions of our sister circuits that have interpreted *Marsh*, citing *Joyner v. Forsyth Cnty.*, 653 F.3d 341, 345 (4th Cir. 2011); *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1232 (10th Cir. 1999) (en banc). Recognizing that *Marsh* has limits, however, the district court reasoned that legislative prayers cannot be used to proselytize listeners, or to advance one religion over another.

Turning to the facts at hand, the district court construed Appellants' challenge to the Policy as a facial challenge. The district court reasoned that the Policy strives for neutrality, and, therefore, it is not intended to "proselytize or advance any particular faith, or show any purposeful preference of one religious view to the exclusion of others." As such, the district court held that the Policy is constitutional on its face.

Next, the district court reasoned that Appellants' as-applied challenge to the Policy was not ripe for judicial review. Because the record contained only two Commission meetings that occurred

---

[7] *Lemon* established a three-prong test for determining whether the Establishment Clause is violated: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" 403 U.S. at 612–13 (internal citations omitted).

after the Policy was adopted, the district court reasoned that an as-applied challenge was premature. As the district court stated, "[A]t this point, the factual record before the [c]ourt is far too attenuated to permit any reasoned conclusion concerning the constitutionality of the [P]olicy's application." The district court concluded that, "[w]hile there may be a possibility for future constitutional violations under the [P]olicy, Plaintiffs have not demonstrated that they are '*likely* to suffer irreparable harm before a decision on the merits can be reached.'" (emphasis in original) (citation omitted).

Appellants timely filed an interlocutory appeal.

## II. LEGAL STANDARDS

### A. Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982)). "These factors are not prerequisites to issuing an injunction but factors to be balanced." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998) (citation omitted). The district court need not consider each factor if fewer factors are dispositive of the issue. *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 380 (6th Cir. 2006) (citing *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997)). "When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success

on the merits often will be the determinative factor." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

## B. Appellate Jurisdiction and Standard of Review

"Although a district court's decision whether to grant a preliminary injunction is generally reviewed for an abuse of discretion, in cases with First Amendment implications, the standard of review is de novo." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. (SMART)*, 698 F.3d 885, 889–90 (6th Cir. 2012) (italics and internal citations omitted); *see id.* at 890 (explaining that, "in the First Amendment context, the other [preliminary-injunction] factors are essentially encompassed by the analysis of the movant's likelihood of success on the merits, which is a question of law that must be reviewed de novo" (italics omitted)). Here, Appellants' likelihood of success on the merits is a pure legal question and does not require us to review any factual findings. Thus, we apply de novo review.

## III. DISCUSSION

## A. *Marsh* and its Progeny

Our discussion begins with the Supreme Court's first and only pronouncement on the constitutionality of legislative prayer: *Marsh v. Chambers*, 463 U.S. 783 (1983). In *Marsh*, a state legislator challenged the Nebraska legislature's practice of opening sessions with a prayer led by a Presbyterian chaplain, Robert Palmer, who was paid by the State. 463 U.S. at 784–85. For sixteen years, Palmer was the only clergyman selected to conduct the prayers, which were of the Judeo-Christian tradition. *Id.* at 793. The Eighth Circuit applied the three-part *Lemon* test to strike down Nebraska's prayer practice. *Id.* at 786. However, in reversing and upholding Nebraska's practice, the Supreme Court did not follow the Eighth Circuit's lead and abandoned the *Lemon* test in favor of a history-based analysis. *Id.* at 786.

10

The majority began its opinion by explaining the historical tradition of opening legislative sessions with a prayer. *Id.* Tracing legislative prayer to "colonial times through the founding of the Republic and ever since," *id.*, the Supreme Court recognized that the First Congress, "as one of its early items of business, adopted the policy of selecting a chaplain to open each session with prayer." *Id.* at 787–88. The Senate and House elected their first chaplains in 1789. *Id.* at 788. As the Supreme Court explained, "[i]t can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a Chaplain for each House and also voted to approve the draft of the First Amendment" that "they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable." *Id.* at 790. The Supreme Court concluded that, "[i]n light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society." *Id.* at 792. Thus, the Supreme Court reasoned that, "[t]o invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment." *Id.*

Applying these historical principles, the Supreme Court held that Nebraska's policy passed constitutional muster.

First, the Supreme Court reasoned that the Presbyterian clergyman's long tenure—sixteen years—standing alone, did not "advance[] the beliefs of a particular church. To the contrary, the evidence indicat[ed] that [the clergyman] was reappointed because his performance and personal qualities were acceptable to the body appointing him." *Id.* at 793. Second, because of its historical roots, the Supreme Court stated that the public funds used to compensate the clergyman did not violate the Establishment Clause. *Id.* at 794. Finally, the Supreme Court stated that "[t]he content of the prayer is not of concern to judges where . . . there is no indication that the prayer opportunity

11

has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794–95. The Supreme Court reasoned that it is not for courts to "embark on a sensitive evaluation or to parse the content of a particular prayer." *Id.* at 795.

Although the Supreme Court cautioned courts not to evaluate the content of particular prayers, it expressly noted in a footnote that Palmer removed all references to Christ after receiving a complaint from a legislator:

> Palmer characterizes his prayers as "nonsectarian," "Judeo Christian," and with "elements of the American civil religion." Although some of his earlier prayers were often explicitly Christian, Palmer removed all references to Christ after a 1980 complaint from a Jewish legislator.

*Id.* at 793 n.14 (internal citations to record omitted).

Justice Brennan dissented, in which Justice Marshall joined, reasoning that the majority's decision "is contrary to the doctrine as well the underlying purposes of the Establishment Clause, and it is not saved either by its history or by any of the other considerations suggested in the Court's opinion." *Id.* at 796 (Brennan, J., dissenting). Justice Brennan objected to the majority's failure to apply *Lemon*. Justice Brennan opined that Nebraska's policy violated all three prongs of *Lemon*. *Id.* at 796–801. In concluding, Justice Brennan stated that he was "unconvinced by the Court's arguments, and cannot shake my conviction that legislative prayer violates both the letter and the spirit of the Establishment Clause." *Id.* at 813.

Justice Stevens also dissented, stating that "it seems plain to me that the designation of a member of one religious faith to serve as the sole official chaplain of a state legislature for a period of 16 years constitutes the preference of one faith over another in violation of the Establishment Clause of the First Amendment." *Id.* at 823 (Stevens, J., dissenting). Justice Stevens took issue with the majority's failure to evaluate the particular prayers offered, reasoning that the majority's

unwillingness to do so was "because it would be unable to explain away the clearly sectarian content of some of the prayers given by" Palmer. *Id.*

The year after *Marsh* was decided, the Supreme Court decided *Lynch v. Donnelly*, 465 U.S. 668 (1984), in which the Court upheld a public crèche display that served as just one aspect of a larger holiday display to celebrate the season. In *Lynch*, Justice O'Connor in concurring with the majority compared the crèche at issue to legislative prayer:

> These features combine to make the government's display of the crèche in this particular physical setting no more an endorsement of religion than such governmental "acknowledgments" of religion as legislative prayers of the type approved in *Marsh* . . . Those government acknowledgments of religion serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society. For that reason, and because of their history and ubiquity, those practices are not understood as conveying government approval of particular religious beliefs.

465 U.S. at 692–93 (O'Connor, J., concurring).

Six years after *Marsh*, the Supreme Court revisited footnote 14, in which the Court had expressly noted that Palmer had removed all references to Christ in his prayers. In *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 603 (1989), a case finding unconstitutional a crèche display that had been placed on the grand staircase of a county courthouse while holding that the display of a menorah next to a Christmas tree was not an unconstitutional endorsement of the Christian and Jewish faiths, the Supreme Court stated:

> [I]n *Marsh* itself, the Court recognized that not even the "unique history" of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief. The legislative prayers involved in *Marsh* did not violate this principle because the particular chaplain had "removed all references to Christ." Thus, *Marsh* plainly does not stand for the sweeping proposition . . . that all accepted practices 200 years old and their equivalents are constitutional today.

(internal citations omitted).

13

The Supreme Court again briefly discussed *Marsh* in two more recent cases decided on the same day, both of which challenged the placement of monuments of the Ten Commandments on government property. *See Van Orden v. Perry*, 545 U.S. 677 (2005); *McCreary Cnty., Ky. v. ACLU of Ky.*, 545 U.S. 844 (2005). In *Van Orden*, Chief Justice Rehnquist recognized in a plurality opinion that "the role of God in our Nation's heritage" and historical principles led the Court "to hold that the Establishment Clause permits a state legislature to open its daily sessions with a prayer by a chaplain paid by the State." 545 U.S. at 687–88 (citing *Marsh*, 463 U.S. at 792). In a footnote, the Chief Justice recognized that, in *Marsh*, the Court had "rejected the claim that an Establishment Clause violation was presented because the prayers had once been offered in the Judeo-Christian tradition." *Id.* at 688 n.8.

In *McCreary County*, the Supreme Court noted that the "Establishment Clause doctrine lacks the comfort of categorical absolutes. In special instances [the Supreme Court] ha[s] found good reason to hold governmental action legitimate even where its manifest purpose was presumably religious," citing to *Marsh*. 545 U.S. at 859 n.10. In dissent, Justice Scalia also recognized that *Marsh* approved "government-led prayer to God," as long as "there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 892, 894.

Against this backdrop we first consider whether the district court erred in concluding that the Commission's Policy is constitutional on its face. Next, we consider whether the district court correctly determined that an as-applied challenge to the Policy was not ripe for judicial review.

## B. Facial Challenge to Policy

Where, as here, the relief requested reaches beyond the particular circumstances of the Appellants, "the claims that are raised are properly reviewed as facial challenges. . . ." *Disc.*

*Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 522 (6th Cir. 2012) (citing *John Doe No. 1 v. Reed*, ___ U.S. ____, 130 S.Ct. 2811, 2817 (2010)). "Facial challenges, the Supreme Court has noted, are disfavored for several . . . reasons: [1] they 'often rest on speculation' and thus 'raise the risk of premature interpretation,' [2] they 'run contrary to the fundamental principle of judicial restraint,' and [3] they 'threaten to short circuit the democratic process.' " *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 826 (6th Cir. 2012) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008)). As we have previously explained, "[f]acial invalidation is strong medicine that is not to be casually employed." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564 (6th Cir. 2012) (internal quotation marks omitted).[8]

### 1. Applicability of *Lemon v. Kurtzman*

Appellants first invite us to determine that the Commission's Policy is unconstitutional on its face by applying *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Given the Supreme Court's choice not to apply *Lemon* in *Marsh*, we decline Appellants' invitation. *See ACLU of Ohio v. Capital Square Review and Advisory Bd.*, 243 F.3d 289, 305–06 (6th Cir. 2001) (en banc) ("It is worth mentioning, perhaps, that even the author of the *Lemon* decision, the late Chief Justice Burger, did

---

[8] In assessing Appellants' facial challenge, the district court articulated that: "A facial challenge to a legislative [a]ct is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [a]ct would be valid," quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987). It is not apparent that the *Salerno* "no set of circumstances" test governs facial challenges under the Establishment Clause. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 313–14 (2000) (analyzing a facial challenge in an Establishment Clause case without reference to *Salerno*); *Bowen v. Kendrick*, 487 U.S. 589, 600–02 (1988) (same); *id.* at 627 n.1 (Blackmun, J., dissenting) (agreeing with majority's implicit decision not to apply *Salerno*); *Commack Self-Serv. Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 425 n.7 (2d Cir. 2002) (declining to decide whether the *Salerno* test applied to facial challenge under the Establishment Clause). We need not decide whether the *Salerno* test applies because *Marsh* supplies the controlling standard for legislative prayer cases.

not see fit to apply the *Lemon* test when he wrote the Court's opinion in the legislative chaplain case, *Marsh*. . . .").

## 2. Applying *Marsh* to the Facial Challenge

Having determined that the *Lemon* test does not apply to legislative prayer cases, we turn next to the contours of *Marsh* and conclude, as did the district court, that Appellants are not likely to succeed on the merits of their facial challenge to the Policy. Accordingly, the district court's decision denying Appellants' preliminary injunction will not be disturbed on this basis.

The Supreme Court in *Marsh* permitted legislative prayer as long as "there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." 463 U.S. at 794–95. Unless there is an indication that the prayer opportunity has been exploited to advance one faith or belief over another, the Supreme Court cautioned that courts should not "embark on a sensitive evaluation or . . . parse the content of a particular prayer." *Id.* at 795.

When applying the *Marsh* standard to the facts here, it is evident that the Commission's Policy is facially constitutional. The Policy allows for three different types of invocations: (1) a reflective moment of silence; (2) a short solemnizing message; or (3) a prayer. The County's procedures for selecting potential invocation speakers are not discriminatory and allow any bonafide religious organization to participate. The Policy calls for a list of religious assemblies in the County to be compiled on a yearly basis, and, if a specific religious assembly in the County is not on the list, it can write to the County to be included. Further, the Policy allows religious assemblies from outside the County to give the opening invocation if a resident of the County requests their inclusion. The Policy expressly states that it is "intended to acknowledge and express the

16

Commission's respect for the diversity of religious denominations and faiths represented and practiced among the citizens of Hamilton County."

In addition, the Policy states that invocation speakers will be notified: "To maintain a spirit of respect for all, the Commission requests only that the opportunity not be exploited as an effort to convert others to the particular faith of the invocation speaker, nor to disparage any faith or belief different than that of the invocation speaker." On its face, the Policy is tailored to comply with *Marsh* and it does not advance any one faith or belief over another.

To the extent that the procedures for selecting "eligible clergy" members as invocation speakers might have the effect of advancing one faith or belief over another, that has yet to be seen, and is not properly before us as a facial challenge to the Policy. The Policy, on its face, ensures that any organization that calls itself "religious" may participate, regardless of the specific beliefs it espouses. Even if an established religious organization does not have a Yellow Pages listing, it can write the Commission and request to participate in invocations. Without the ability to establish basic criteria for selecting religious groups to participate in the prayer invocations, the Commission would be unable to ensure that speakers are members of bonafide religious organizations, as opposed to commercial entities or other groups with missions completely unrelated to the Commission's practice of solemnizing its meetings with an invocation.

Appellants misplace their reliance on the Fourth Circuit's decision in *Joyner v. Forsyth County, N.C.*, 653 F.3d 341 (4th Cir. 2011), and the Seventh Circuit's decision in *Hinrichs v. Bosma*, 440 F.3d 393 (7th Cir. 2006), to argue that the Policy is unconstitutional on its face. *Joyner* and *Hinrichs* did not involve successful facial challenges to legislative prayer policies.

In *Joyner*, plaintiffs Janet Joyner and Constance Blackmon challenged the Forsyth County Board of Commissioners' ("Forsyth County") practice of beginning its meetings with an invocation

17

delivered by a local religious leader. 653 F.3d at 342. In 2007, Forsyth County adopted a formal written policy. *Id.* at 343. "Using the Yellow Pages, [I]nternet research, and consultation with the local Chamber of Commerce, the clerk to the Board compiled and maintained the 'Congregations List'—a database of all religious congregations with an established presence in the community." *Id.* The list was updated once a year, and "any congregation could confirm its inclusion by writing to the clerk." *Id.* The clerk mailed a letter to all religious leaders on the Congregations List and "informed those individuals that they were eligible to deliver an invocation and could schedule an appointment on a first-come, first-serve basis." *Id.* The letter informed the religious leaders that the opportunity was voluntary, and that "the Board requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker." *Id.* Speakers were not scheduled for consecutive meetings, nor were they scheduled for more than two meetings in any calendar year. *Id.* Essentially, the Forsyth County's facial policy in *Joyner* was identical to the Commission's Policy here.

However, the Fourth Circuit in *Joyner* held that Forsyth County's policy, "as implemented, cannot withstand scrutiny" because "[t]he undisputed record shows that the prayers delivered at the outset of Board meetings from May 29, 2007 through December 15, 2008 referred to Jesus, Jesus Christ, Christ, or Savior with overwhelming frequency." *Id.* at 349 (internal quotation marks omitted). Because almost four-fifths of prayers contained such explicit sectarian references, the court of appeals held that the application of the policy ran afoul of the Supreme Court's decision in *Marsh*. *Id.* at 349–50. However, the court of appeals observed that the Forsyth County's policy was neutral on its face. *Id.* at 353. It was the *implementation* of the policy that the court of appeals held unconstitutional.

18

Appellants' reliance on *Hinrichs* is also inapposite. In *Hinrichs*, four taxpayers sued the Speaker of the Indiana House of Representatives, challenging the Indiana House's 188 year-old practice of opening official meetings with a brief prayer or invocation. 440 F.3d at 394–95. The Indiana House did not have a formal policy. The record reflected that a majority of the prayers for the 2005 calendar year were Christian prayers, which were identifiable by supplications to Christ. *Id.* at 395. After a bench trial, the district court held that "the consistent and pervasive use of Christian invocations in Indiana is the sort of practice that *Marsh* found unacceptable" because "[i]t is a 'prayer opportunity [that] has been exploited to . . . advance . . . one . . . faith or belief.' " *Id.* at 398–99 (second set of brackets in original). Like *Joyner*, the *Hinrichs* court of appeals did not determine that a prayer policy was unconstitutional on its face. Rather, the Indiana House's prayer practice, as implemented, was determined to be unconstitutional by the district court, and the Seventh Circuit denied the Speaker a stay of that ruling.[9]

Here, the Policy is facially constitutional. The Policy aims to respect the diversity of all religious groups, and it does not seek to advance one faith or belief over another. The Policy is similar to other policies that have been recognized as facially neutral by our sister circuits. *See, e.g.*, *Rubin v. City of Lancaster*, 710 F.3d 1087, 1097–98 (9th Cir. 2013); *Atheists of Fla., Inc. v. City of Lakeland, Fla.*, 713 F.3d 577, 592–93 (11th Cir. 2013); *Joyner*, 653 F.3d at 353. Indeed, not one of our sister circuits that have addressed this same issue have struck down a legislature's policy as facially unconstitutional.

_____

[9] In a later opinion, the Seventh Circuit concluded that the taxpayers lacked standing and reversed the district court's judgment on that basis. *See Hinrichs v. Speaker of the House of Representatives of the Ind. Gen. Assembly*, 506 F.3d 584 (7th Cir. 2007).

Accordingly, the district court's decision that Appellants are not likely to succeed on the merits of their facial challenge to the Policy is correct. On its face, the Policy complies with *Marsh* and does not advance one faith or belief over another. Thus, the district court properly denied to issue a preliminary injunction on this basis.

## C. As-Applied Challenge to Policy

Although the Policy is constitutional on its face, it can still be unconstitutional as implemented by the Commission. Ordinarily, "'[t]he usual judicial practice is to address an as-applied challenge before a facial challenge . . . because this sequencing decreases the odds that facial attacks will be addressed unnecessarily.'" *Berry v. Schmitt*, 688 F.3d 290, 302 (6th Cir. 2012) (quoting *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 327–28 (6th Cir. 2009) (en banc)). However, because there were only two post-policy prayer invocations, the district court determined that an as-applied challenge was not ripe for judicial review due to the lack of a developed record. We agree.

As described above, the record before the district court displayed that two meetings occurred after the implementation of the Policy. Both meetings began with prayers which referenced "Jesus." Under *Marsh*, prayer invocations are appropriate as long as they do not "proselytize or advance any one, or . . . disparage any other, faith or belief." 463 U.S. at 794–95. The district court was correct in concluding that a record of two prayers after the implementation of the Policy is insufficient to determine whether the Commission's Policy, as implemented, is unconstitutional and violative of *Marsh*. Based on two instances in a relatively short period of time, the Court cannot say whether the Commission's application of its Policy proselytizes or advances Christianity or disparages other beliefs.

As the district court put it:

This dearth of evidence–necessarily brought about by the brevity of the period between the adoption of the [P]olicy and the hearing on Plaintiffs' Motion–is drawn into sharp relief when compared with the facts before other courts presented with similar questions. For example, in *Hinrichs*, the Seventh Circuit considered a prayer practice that dated back 188 years, and it reviewed over 50 individual invocations. *See Hinrichs*, 440 F.3d at 395. The plaintiffs in *Pelphrey* presented seven years' worth of legislative prayer. *See Pelphrey*, 547 F.3d at 1267. And in *Joyner*, even though a written policy was adopted mid-litigation, the Fourth Circuit was presented with a record comprising more than one year of post-policy prayers. *See Joyner*, 653 F.3d at 344.

With almost a year of time that has passed since the Policy's implementation, the district court is now in a position to address this aspect of Appellants' constitutional challenge. This case should continue through its regular course.[10]

## IV. CONCLUSION

For the reasons stated above, we affirm the district court's denial of Appellants' motion for a preliminary injunction.

---

[10] The Supreme Court recently granted certiorari in a legislative prayer case. *See Town of Greece v. Galloway*, ___ S. Ct. ___, No. 12-696, 2013 WL 2149803 (May 20, 2013). In *Galloway v. Town of Greece*, 681 F.3d 20, 22 (2d Cir. 2012), the Second Circuit determined that the Town of Greece's "prayer practice [, as implemented,] impermissibly affiliated the town with a single creed, Christianity." In reaching this determination, the Second Circuit held that the appropriate question was "whether the town's practice, viewed in its totality by an ordinary, reasonable observer, conveyed the view that the town favored or disfavored certain religious beliefs." *Id.* at 29. On the record before it, the Second Circuit concluded "that the town's prayer practice must be viewed as an endorsement of a particular religious viewpoint." *Id.* at 30. The question presented in the petition for certiorari in light of *Marsh* is: "Whether the court of appeals erred in holding that a legislative prayer practice violates the Establishment Clause notwithstanding the absence of discrimination in the selection of prayer-givers or forbidden exploitation of the prayer opportunity."